THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS BRIAN KEEN, Defendant-Appellant.

First District (6th Division) No. 1—88—1764

Opinion filed November 30, 1990.

942

Williams & Marcus, Ltd., of Chicago (John F. Dziedziak and James I. Marcus, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, Gayle Terry, and Margaret Iwerbon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RAKOWSKI delivered the opinion of the court:

Following a jury trial, defendant Thomas Keen was found guilty of delivering a controlled substance to an undercover narcotics agent on September 18, 1986. Defendant was at the same time acquitted of the same charge based on a sale which took place on August 4, 1986. Defendant was sentenced to a six-year term of imprisonment. On appeal, defendant requests that this court reverse his conviction, contending: that the evidence is insufficient to prove defendant guilty beyond a reasonable doubt; that the trial court erred in excluding testimony relating to an informant's threats to defendant; that an unauthorized communication between a deputy sheriff and the jury deprived defendant of a fair trial; that the State's evidence of other crimes deprived defendant of a fair trial; and that the prosecutor's conduct during closing argument was improper. We affirm.

The following facts were elicited at trial. Agent John McQuinn testified that on August 4, 1986, he was on an undercover assignment from the Metropolitan Police Enforcement Group. At about 5 p.m., Agent McQuinn received a call on his beeper, which upon McQuinn's returning the call, he learned originated from defendant. Defendant asked Agent McQuinn if McQuinn was interested in purchasing an ounce of cocaine. McQuinn said that he was interested in purchasing 3.6 grams of cocaine, and the two agreed to meet at 6:30 p.m. that day at the Steak & Egger restaurant.

McQuinn met with defendant as planned. Other surveillance

agents, whom McQuinn had informed of the meeting, observed the meeting. Defendant handed McQuinn a clear plastic bag, which was subsequently found to contain cocaine. McQuinn paid defendant $270 for the bag of cocaine. At the time, defendant produced another bag, which he said was the ounce of cocaine he had earlier offered to sell McQuinn. McQuinn left open the possibility that he would purchase larger amounts of cocaine from defendant in the future if McQuinn was satisfied with the quality of the 3.6 grams. According to McQuinn, defendant told him that defendant was ready to sell cocaine whenever McQuinn wished to purchase it.

Agent McQuinn further testified that on September 18, 1986, defendant again contacted him on his beeper. At this time, defendant asked if McQuinn wanted to purchase a pound of cocaine. McQuinn stated that he wished to do so, and defendant stated that he would contact McQuinn later that evening after defendant obtained the cocaine from his "connect." Later that day, defendant again paged McQuinn, informing him that he could obtain eight ounces of cocaine, and it was agreed that the two would meet at a gas station at 171st and Harlem in Tinley Park.

The two met as planned. Defendant handed McQuinn a box, which was tested on the spot and revealed to contain cocaine. After conducting the field test, McQuinn activated a prearrest signal to alert a surveillance team to arrest defendant. The surveillance team then arrested defendant. Two other agents, who observed the August 4 and September 18, 1986, transactions, testified at trial and confirmed McQuinn's testimony.

McQuinn testified that Gary Giusfredi was a police informant who worked for him in 1986. Giusfredi had been an informant for about a month prior to August of 1986. Giusfredi told McQuinn that defendant would contact McQuinn. In August and September of 1986, McQuinn said that he and Giusfredi discussed defendant about 10 to 20 times. The arrest of defendant was the first arrest that had resulted from Giusfredi's efforts as an informant. McQuinn stated that, based on his conversations with Giusfredi, he was aware that defendant was calling Giusfredi about selling McQuinn the cocaine and that defendant was anxious for McQuinn to buy cocaine from defendant.

Giusfredi testified that he had known defendant for about 10 years, he and defendant having been introduced through a mutual friend, Steve Skryd. Giusfredi had used cocaine with both defendant and Skryd on several occasions, the last time being several years ago. Giusfredi had been hospitalized in 1983 in connection with his

Valium usage and continued to undergo counseling. Giusfredi stated that he was angry with defendant for starting Steve and David Skryd's younger brother, Bobby Skryd, on marijuana. Bobby Skryd testified later at trial, however, that he had never used marijuana or any other drug with defendant and that defendant never gave him cocaine or marijuana.

Giusfredi was introduced to Agent McQuinn through his friend David Skryd, who was an attorney. This introduction occurred two or three months prior to defendant's arrest. Giusfredi was asked to "set up" defendant as a favor to David Skryd. Giusfredi was not paid to be an informant and did not profit from defendant's sales.

Giusfredi told defendant that he had lost some money which he had loaned a friend when the friend died. Giusfredi told defendant that he was out several thousand dollars and that he could make some of the money back if defendant would deliver cocaine to Giusfredi's friends. Giusfredi did not tell defendant that the friends he referred to were agents. Giusfredi stated that he asked defendant to deliver the cocaine as a favor and had several conversations with defendant to persuade him to deliver the cocaine before he agreed to do so. Giusfredi gave defendant Agent McQuinn's beeper number. Giusfredi testified that he was in Utah on August 4, 1986, and that defendant telephoned him that day to inform him how well the deal had gone. Giusfredi acknowledged that he asked defendant to deliver a full pound of cocaine, but that as of August 4, 1986, he no longer asked defendant to deliver cocaine as a favor. Giusfredi also acknowledged that he told defendant that if the pound of cocaine was delivered, he would be reimbursed some of the money he had lost. Giusfredi testified that he never threatened defendant with physical violence or told defendant that he would make life miserable for him. Giusfredi did not direct defendant to a supplier of cocaine and was in Utah at the time of both transactions. Giusfredi said that he never told defendant that he was in desperate need of money. Giusfredi testified that defendant was willing to make the delivery and was "looking to make money," but Giusfredi did not reveal any agreement that he would pay defendant for making the deliveries.

Defendant testified in his own behalf at trial. Defendant had at one time washed cars for Giusfredi. Defendant stated that he and Giusfredi first discussed defendant's obtaining cocaine around May of 1986. Defendant initially told Giusfredi that he did not have the ability to help Giusfredi. According to defendant, Giusfredi made the request that defendant obtain cocaine between 50 and 100 times

over the next few months. During some of these conversations, Giusfredi threatened defendant and defendant's friend, Steven Skryd, with bodily harm if defendant backed out of the contemplated transaction. Defendant stated that on August 4, 1986, Giusfredi gave defendant Agent McQuinn's beeper number about 15 minutes before defendant called McQuinn. While defendant had used cocaine before, he had never sold or delivered cocaine before. He obtained the cocaine for both sales from friends of friends, with "great difficulty." Defendant did not have the cocaine himself at the time. Defendant testified that the person from whom he got the cocaine gave it to him without charge and expected that defendant would give the money defendant received to the person from whom defendant got the cocaine.

Defendant further testified that on August 14, 1986, after the first delivery, Giusfredi contacted defendant, demanding that defendant deliver a pound of cocaine to McQuinn and another person. (This other person was represented to defendant by Giusfredi as "Bob Novak," who, unbeknownst to defendant, was also an undercover agent.) Defendant again said that he could not help Giusfredi. Defendant met with Giusfredi, McQuinn and Novak that evening. Giusfredi told defendant that McQuinn and Novak expected a delivery of cocaine, and that if this did not occur, defendant would "suffer great bodily harm" and that Giusfredi would make defendant's life "miserable." Hoping to appease them, defendant delivered a gram of cocaine, which was left over from the August 4, 1986, delivery. McQuinn and Novak left the meeting, and according to defendant, Giusfredi told defendant that Giusfredi and the others had spent the afternoon "thinking of appropriate ways to deal with" defendant for his failure to supply the cocaine. Defendant further testified that between August 14, 1986, and September 18, 1986, Giusfredi contacted defendant at least eight times, urging defendant to deliver the cocaine and threatening defendant.

Steve Skryd testified that Giusfredi had threatened him. As early as January of 1986, Giusfredi began calling Skryd, sometimes two or three times a day. The trial court sustained objections to Skryd's testifying as to the "nature" of conversations between Giusfredi and defendant.

During Agent McQuinn's testimony, McQuinn stated that he had a hard time locating defendant because defendant was driving a stolen car with stolen plates. Defense counsel's objection was sustained, and the court told the jury to disregard the remark. During closing argument, the prosecutor laid an exhibit—a bag containing

one-half ounce of cocaine—on the jury rail. Defendant objected to this, but the trial court overruled the objection.

At the hearing on defendant's post-trial motion, defendant's attorney submitted an affidavit wherein the attorney stated that Deputy Sheriff Linda Mangano told him that the jury wanted to know when they would be fed (while deliberating). According to defendant's attorney, Mangano told him that she told the jury that if the jury did not reach a decision by dinner, they would be fed, and if the jury did not reach a decision by 9 p.m. they would go to a motel. Mangano testified that she told the jurors that they would be fed at 5:30 or 6 o'clock, but that she did not tell the jurors anything else. Defendant's attorney requested a continuance for the purpose of calling the jury foreman as a witness, but the court denied the request for a continuance and denied defendant's motion for a new trial.

■■ ■ The first issue we resolve is whether the defendant was proven guilty beyond a reasonable doubt. At trial, defendant raised the defense of entrapment. The question of whether entrapment exists is one for the finder of fact and will not be disturbed on appeal unless the reviewing court concludes that entrapment exists as a matter of law. (*People v. Tipton* (1980), 78 Ill. 2d 477, 487, 401 N.E.2d 528.) The Illinois entrapment statute provides as follows:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1987, ch. 38, par. 7—12.)

The critical inquiry in an entrapment case, then, is whether the criminal purpose originated with the defendant. (*People v. Cross* (1979), 77 Ill. 2d 396, 404, 396 N.E.2d 812.) If some evidence on the issue of entrapment is raised, the State must prove beyond a reasonable doubt that defendant was not entrapped, as well as proving all other elements of the offense. *People v. Andreano* (1978), 64 Ill. App. 3d 551, 556, 381 N.E.2d 783.

■■ Entrapment is established when the criminal design originates with government officials, they implant in the mind of an innocent person the disposition to commit the offense, and induce its commission in order to prosecute. (*People v. Collins* (1990), 199 Ill. App. 3d 163, 167, 556 N.E.2d 835, citing *Sorrells v. United States*

(1932), 287 U.S. 435, 442, 77 L. Ed. 413, 417, 53 S. Ct. 210, 212-13.) Where a defendant already has an intent to commit a crime, and does so merely because an officer affords him an opportunity to commit the crime or purposefully aids and encourages him in its perpetration, there is no entrapment. (*People v. Gaytan* (1989), 186 Ill. App. 3d 919, 925, 542 N.E.2d 1163.) A defendant's predisposition to commit a crime is one of the crucial elements of the entrapment defense. (*People v. Schillaci* (1988), 171 Ill. App. 3d 510, 517, 526 N.E.2d 871.) For an entrapment defense to succeed, the evidence must disclose an improper inducement on the part of the public officer or employee and a lack of predisposition to commit the crime on defendant's part. *People v. Katsigiannis* (1988), 171 Ill. App. 3d 1090, 1097, 526 N.E.2d 508.

In arguing that he was entrapped as a matter of law, defendant relies heavily on the case of *People v. Fisher* (1979), 74 Ill. App. 3d 330, 392 N.E.2d 975. In *Fisher*, the court held that the People failed to rebut the defendant's evidence of entrapment beyond a reasonable doubt. (*Fisher*, 74 Ill. App. 3d at 335.) Critical factors in the court's analysis included that the agent was not able to procure any drugs from defendant on occasions other than the one occasion which prompted defendant's arrest, and that the defendant had "no prior record of drug offenses." (*Fisher*, 74 Ill. App. 3d at 335.) The court concluded that defendant was an "unwary innocent" whose participation in the criminal activity was initiated by the State. *Fisher*, 74 Ill. App. 3d at 334.

Here, defendant himself testified that he had done cocaine "many times," and defendant procured and delivered cocaine on more than one occasion. Moreover, perhaps the most important distinguishing feature of the *Fisher* case is that there, defendant was repeatedly requested to sell the officer amphetamines, but in fact only sold the agent tablets which were not a controlled substance. Thus, the conviction in *Fisher* was for the unlawful delivery of what was represented to be a controlled substance. Here, the defendant was able to obtain and sell the real thing.

While defendant testified at length about harassing and threatening behavior on the part of Giusfredi, and that defendant made the sale only to appease Giusfredi and the agents and to get them "off his back," this testimony is contradicted by Giusfredi. Giusfredi testified that he did not call defendant nearly as often as defendant claimed. Giusfredi specifically denied threatening defendant in any way, or telling defendant that he, Giusfredi, was in severe financial distress. Giusfredi testified that defendant often

called him and that defendant was willing to make the sales and was looking to make money.

● 4 Generally, predisposition is established by a defendant's willingness to participate in criminal activity before defendant's initial exposure to government agents. (*People v. Connor* (1988), 176 Ill. App. 3d 900, 906, 531 N.E.2d 966.) The determination of predisposition rests upon the facts of the case. (*Katsigiannis*, 171 Ill. App. 3d at 1097.) Factors to be considered in assessing predisposition include defendant's initial reluctance or willingness to commit the crime, the defendant's familiarity with drugs and his willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's prior or current use of drugs, and the defendant's participation in the testing or cutting of drugs. (*Schillaci*, 171 Ill. App. 3d at 517-18.) Whether defendant had ready access to a drug supply may be considered. (*People v. Beavers* (1986), 141 Ill. App. 3d 790, 795, 491 N.E.2d 438.) The fact that defendant has no prior criminal record is a factor as well. *Andreano*, 64 Ill. App. 3d at 557.

■ Applying these factors to the present case, it is clear that whether defendant was entrapped was a question for the jury to consider, and the jury's rejection of the entrapment defense should not be disturbed. While defendant testified that he was reluctant to make the sales of cocaine, Giusfredi's testimony suggested defendant's willingness to engage in the transaction and that defendant was looking to make a profit. To be sure, defendant had no record of selling drugs before and testified that he never did sell drugs before. Yet, defendant had used cocaine on numerous occasions in the past. While defendant stated that it took him months to obtain the cocaine and that he obtained the cocaine with "great difficulty," neither Giusfredi nor McQuinn directed defendant to the source of the cocaine, and defendant was able to obtain the cocaine through friends of friends.

The evidence in this case reveals two fundamentally different stories related by defendant, on the one hand, and Giusfredi and McQuinn on the other. Where such evidence is conflicting on the question of entrapment, it is for the jury to determine whether entrapment has occurred, and the finding should not be set aside where there is sufficient evidence for the jury to determine that defendant was predisposed to commit the offense. See *Tipton*, 78 Ill. 2d at 487-88; *People v. Terry* (1976), 38 Ill. App. 3d 795, 797-98, 349 N.E.2d 129.

■ At oral argument, defendant urged this court to accept the

proposition that as defendant was acquitted of the August 4, 1986, charge, defendant must necessarily have been entrapped as a matter of law as to the second charge, based on the September 18, 1986, sale. We are not persuaded by this argument. That a defendant has been found not guilty as to an initial delivery of a controlled substance in a case where defendant raises the defense of entrapment does not mandate a finding that defendant was entrapped as to a subsequent delivery. See *People v. Washington* (1987), 154 Ill. App. 3d 648, 654, 506 N.E.2d 1387.

■ Moreover, key factual differences in the two deliveries would support the jury's finding that there was no entrapment as to the second offense. For instance, McQuinn testified that at the time of the first delivery, defendant attempted to sell a pound of cocaine and told McQuinn that he could sell cocaine whenever McQuinn wanted to buy. Giusfredi testified that he no longer requested that defendant deliver cocaine as a favor after the first delivery. Giusfredi also testified that defendant called him after the first delivery, and defendant said he had a new "connect." Whether or not an initial entrapment continues through a series of criminal transactions is a question for the trier of fact to decide (*Washington*, 154 Ill. App. 3d at 653), and the jury was properly allowed to resolve the issue in this case.

Defendant next contends that the trial court erred in excluding the testimony of Steven Skryd on the grounds that Skryd's testimony was inadmissible hearsay.

■ Evidence, whether oral or written, of an out-of-court statement that is offered to establish the truth of the matter asserted is hearsay because its value as evidence depends on the credibility of an out-of-court asserter for whom there is no opportunity for cross-examination. (*People v. Rogers* (1980), 81 Ill. 2d 571, 577-78, 411 N.E.2d 223.) Where, however, the evidence is offered for a purpose which is other than establishing the truth of the matter asserted, the statement is not hearsay. In this case, defense counsel sought to elicit testimony from Steve Skryd regarding the nature of conversations between Giusfredi and defendant. The State objected and the trial court sustained the objections. No specific ground for the objection was made, and no offer of proof was made.

Defendant contends that the trial court sustained the objection, improperly, on hearsay grounds. The State argues that, in fact, the testimony was properly excluded by the trial court based on a lack of proper foundation as to when the conversations occurred. Given that no ground was stated for the objection, this court cannot know

the trial court's reason for sustaining the objection. If, as defendant contends on appeal, the testimony sought to be elicited was testimony about Giusfredi threatening defendant, such testimony would not be properly excludable as hearsay, because defendant's state of mind is clearly at issue. *People v. Poulos* (1990), 196 Ill. App. 3d 653, 660, 554 N.E.2d 448.

However, it is not clear to this court that defendant was seeking to introduce evidence of Giusfredi's threats. Skryd testified that defendant would often be at Skryd's house when Giusfredi called, and Skryd would get on the phone with them, or defendant would tell Skryd of the conversations afterward. When defense counsel asked Skryd about the "nature" of the conversation, the State's objection was sustained. Defense counsel next asked Skryd if Giusfredi ever said anything to defendant about cocaine. This question was also objected to and the objection was sustained. It is thus apparent that the questions, as posed, do not mention threatening conduct on the part of Giusfredi. Defendant is, in effect, asking this court to assume a fact that has not been established.

The very purpose of an offer of proof is to reveal the nature and substance of the proffered testimony, so as to enable the trial judge to rule on the objection. (*People v. Duarte* (1979), 79 Ill. App. 3d 110, 398 N.E.2d 332.) The offer of proof will preserve the issue for appeal and enable the appellate court to review the propriety of the trial court's ruling of exclusion. (*People v. Johnson* (1977), 47 Ill. App. 3d 362, 372-73, 362 N.E.2d 701.) Here, the initial question was unclear as to the date of the conversation at issue, the type of conversation (whether it was conversation Skryd overheard or conversation defendant related to Skryd), and the question allowed for a response concerning any number of matters in addition to whether Giusfredi threatened defendant. An offer of proof is required when it is not clear what the witness will testify to and it is not clear what purpose the testimony will serve. (See *People v. Mireles* (1979), 79 Ill. App. 3d 173, 193, 398 N.E.2d 150; *People v. Robinson* (1977), 56 Ill. App. 3d 832, 837, 371 N.E.2d 1170.) This court concludes that the exclusion of Skryd's testimony was not error. See also *People v. Gordon* (1980), 82 Ill. App. 3d 906, 914, 403 N.E.2d 570.

Defendant next contends that he was denied a fair trial based on the deputy sheriff's alleged improper communication with the jury while the jury deliberated. At the hearing on defendant's motion for a new trial, defendant's attorney produced his own affidavit, which stated that a deputy sheriff, Linda Mangano, told defend-

ant's attorney that she had a conversation with the jury. According to the affidavit, Mangano told the attorney that at about 4 p.m. the jurors "buzzed" her and asked when they would be fed. She told the jury that if they did not reach a decision by dinner, they would be fed, and that if they did not reach a decision by 9 p.m., they were going to a motel. The affidavit further averred that at about 4:17 p.m., the jury returned a verdict which jurors later said was a compromise verdict.

Mangano was called to the witness stand. She acknowledged telling the jury that they would be fed at 5:30 or 6 o'clock, but she denied that she told the jury that they would be going to a motel if a verdict was not reached by 9 p.m. Defendant requested a continuance to call the testimony of the jury foreman to rebut Mangano's testimony. The court denied the continuance, however, and denied defendant's motion for a new trial. The trial court allowed defendant's attorney's representations as to what the testimony of the foreman would have been (to the effect that Mangano communicated with the jury as defendant's attorney stated in his affidavit) to stand as an offer of proof.

■■ The settled rule is that before a jury verdict will be set aside due to an unauthorized communication with the jury, the defendant must show that he has been prejudiced. *People v. Simms* (1976), 38 Ill. App. 3d 703, 707, 348 N.E.2d 478, citing *People ex rel. Walker v. Pate* (1973), 53 Ill. 2d 485, 505, 292 N.E.2d 387.

A number of issues are presented by defendant's motion for a new trial on this ground and the trial court's denial of the motion for continuance. Defense counsel's assertion in his affidavit was incompetent. The statement that jurors later said that they returned a "compromised" verdict is not only conclusory, but ambiguous as well. No indication is made as to who the jurors were who said this and what is meant by a compromised verdict.

Also, it appears from the record that the trial judge did not consider whether defendant may have been prejudiced by the alleged statement, but rather based his denial of a continuance on his belief that the jurors could not impeach their verdict. Yet, the purpose of calling the jury foreman to testify was not to impeach the verdict, but presumably was rather to determine if the alleged remarks may have hastened the jury to reach a verdict.

The record reveals that the trial judge was willing to accept as true that the sheriff had informed the jury not only that they would be fed at dinner time, but that she told the jury they would be taken to a hotel at 9 p.m. if a decision was not reached at that

time. Therefore, it is necessary to examine case law involving unauthorized communications of the nature involved here.

Defendant cites *People v. Kawoleski* (1924), 313 Ill. 257, 145 N.E. 203, which is clearly distinguishable. In *Kawoleski*, the bailiff had a conversation with jurors where the bailiff stated "it should not take more than two or three minutes to convict that bird." The court held that the comment was so flagrant and manifestly intended to influence the jury that the conviction was reversed. (*Kawoleski*, 313 Ill. at 259-60.) Obviously, we are dealing with a different type of comment in this case—one much less manifestly intended to influence the jury.

Probably the earliest Illinois case involving similar facts is *McIntyre v. People* (1865), 38 Ill. 514. In *McIntyre*, the trial judge informed the deliberating jury at 9 p.m. that if there was no possibility of a verdict within the next 30 minutes, the court would be adjourned until morning. In fact, the court was adjourned until morning, and after several hours of further deliberation, the jury returned a verdict. The Illinois Supreme Court held that defendant's claim that the verdict may have been hastened was belied by the jury's further deliberation. The court also stated "[n]or do we perceive, that with men qualified to act as jurors, having in charge the life of a fellow being, that such a consideration could have produced such a result." *McIntyre*, 38 Ill. at 520.

In another early case, *Rafferty v. People* (1874), 72 Ill. 37, the Illinois Supreme Court considered an alleged improper communication from the court to a jury during deliberation. The judge sent the deputy sheriff to the jury at about 9 p.m. to tell the jury that the judge would meet the jury at 7 the next morning. The sheriff, however, told the jury not only this, but also that if a verdict was not reached by the next morning, the jury would be held together until the ensuing Monday (over Thanksgiving weekend). The sheriff even testified that he knew that this hastened the jury's verdict (which was agreed to at a few minutes of 7 a.m. the next day). The court observed that, though improper, there was no way the judge's message as intended could have prejudiced the defendant. Regarding the sheriff's comments to the jury, however, the court observed "[t]his communication on the part of the officer was highly improper. We are unwilling to give the slightest sanction to such practices, and, this being a capital case, if the evidence of guilt had been less clear, in any substantial degree, we should not hesitate to set the verdict aside, on account of the probable prejudice the message might have occasioned by hastening the verdict of the jury."

(*Rafferty*, 72 Ill. at 48.) *Rafferty*, of course, involved the potential of a much longer sequestration over a holiday weekend.

More recent cases, however, have tended to hold that informing a jury that it will be sequestered after a certain time cannot necessarily be considered coercive. See *People v. Thomas* (1989), 185 Ill. App. 3d 1050, 1057-58, 542 N.E.2d 100; *People v. Baggett* (1983), 115 Ill. App. 3d 924, 930, 450 N.E.2d 913, *appeal denied* (1983), 96 Ill. 2d 542, *cert. denied* (1984), 465 U.S. 1032, 79 L. Ed. 2d 698, 104 S. Ct. 1298. But see *People v. Friedman* (1986), 144 Ill. App. 3d 895, 903-04, 494 N.E.2d 706.

■■ In this case, the trial court had not previously notified the jury about the possibility that they would be taken to a hotel for the night if a verdict was not reached by a certain point in the evening. We are inclined to agree with our supreme court's earliest observation that such hasty deliberation for the sake of avoiding sequestration would not be expected of qualified jurors. It seems highly unlikely, moreover, that the information was prejudicial in this case, as the jury returned its verdict with several hours remaining before the time the jury was allegedly notified that sequestration would occur. We therefore hold that the trial court's denial of defendant's motion for a mistrial on this ground and its denial of a continuance were not reversible error.

Defendant further contends that he was denied a fair trial due to the improper introduction of evidence suggesting that defendant had committed other crimes. Specifically, defendant complains of the testimony of Agent McQuinn, who told the jury that he had a "hard time finding where [defendant] was living because [defendant] was driving a stolen car with stolen plates." Defense counsel promptly objected and requested that the jury be instructed to disregard McQuinn's statement. The trial judge granted these requests, but denied defense counsel's request for a mistrial. Moreover, at the close of the evidence at trial, the jury was instructed to disregard all stricken evidence and to consider only admitted evidence.

In *People v. Johnson* (1973), 11 Ill. App. 3d 745, 297 N.E.2d 683, an investigator referred to defendant's "criminal history sheet," which reference the defendant contended deprived defendant of a fair trial. The *Johnson* court analyzed the situation thusly:

> "At the time, however, defense objection to the statement was sustained and the judge immediately instructed the jury to disregard the officer's remark. An instruction to disregard evidence ordinarily cures error in its admission. [Citation.]

This is particularly true when the improper testimony is not directly responsive to the question and is promptly stricken, with an instruction to the jury to disregard it. [Citations.] In the present case, the witness' reference to defendant's 'criminal history sheet' was not solicited by the State's Attorney's question in a calculated attempt to prejudice the jury. Rather, it appears as an inadvertent remark which went beyond the question asked and was then quickly stricken by the court and the jury was instructed to disregard it. We find that the prompt action by the judge relieved the remark of any substantial prejudicial effect. [Citation.]" *Johnson*, 11 Ill. App. 3d at 749.

See also *People v. Edgeworth* (1975), 30 Ill. App. 3d 289, 300-01, 332 N.E.2d 716.

 It is apparent that the testimony as to defendant's driving a stolen car with stolen plates was, like that in *Johnson* and *Edgeworth*, relieved of any substantial prejudicial effect, and did not deprive defendant of a fair trial.

Last, defendant contends that the prosecutor's "inflammatory conduct" during closing argument deprived defendant of a fair trial. During closing argument, the prosecutor laid one of the exhibits, a bag containing one-half pound of cocaine, on the jury rail. Defendant's attorney objected and requested a sidebar conference, but the court overruled the objection and denied the request for a sidebar. It is this conduct that defendant contends was improper and inflammatory.

 Substantial latitude is accorded attorneys in presenting closing argument, and a new trial is not to be granted unless the prosecutor's remarks are so prejudicial as to materially contribute to a defendant's conviction. (*People v. Collins* (1984), 127 Ill. App. 3d 236, 241, 468 N.E.2d 1343.) It is clear that a prosecutor may handle properly admitted exhibits during argument. (See *People v. Eckles* (1980), 83 Ill. App. 3d 292, 301, 404 N.E.2d 358 (prosecutor referred to photograph of victim during closing argument).) Defendant does not contend that the bag of cocaine was not properly admitted into evidence and has advanced no case law or other authority to support sacrosanct treatment of the jury rail.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

LaPORTA, P.J., and McNAMARA, J., concur.