THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JONATHAN MARTIN, Defendant-Appellant.

Second District   No. 2—90—0704

Opinion filed October 9, 1991.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, Kathleen T. Zellner & Associates, of Naperville, and James P. Palermini, of Huck, Bouma, Martin, Charlton & Zellner, of Glen Ellyn, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Howard Brookins, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

A jury convicted defendant, Jonathan Martin, of one count of delivery of between 400 and 900 grams of a controlled substance containing cocaine (Ill. Rev. Stat. 1987, ch. 56½, par. 1401.1(2)), and one count of delivery of between 15 and 100 grams of a substance containing cocaine (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)). On appeal, defendant argues that he was not proved guilty beyond a reasonable doubt of either count because he was entrapped as a matter of law. We affirm.

The State's primary witness was Joseph DeAnda, the undercover agent to whom defendant made the deliveries. On July 12, 1989, DeAnda, a Bensenville police officer assigned to narcotics investigation work with the Du Page Metropolitan Enforcement Group (Du-MEG), met with Jeanine Walters at the Bensenville police station and signed her up as an informant. DeAnda testified that he had never met or heard of Walters before that date. A Bensenville police detective had introduced Walters to DeAnda that day, informing DeAnda that Walters had been arrested for driving with a revoked license after a previous conviction of driving under the influence. DeAnda interviewed Walters. He told her that, in return for being an informant, she might get money and consideration on her pending charge, both normal means of compensating informants.

On Friday, July 14, 1989, DeAnda's supervisor gave him money to buy an ounce of cocaine from defendant. According to DeAnda, this large an amount would be intended not for personal use but for resale to others. DeAnda went to Walters' apartment in Bensenville. About 45 minutes after DeAnda arrived, defendant and his fiancee, Marian Anderson, arrived. Walters had told defendant that he would be meeting her boyfriend "Joe." After Walters introduced the pair to DeAnda, she and Marian went into the kitchen, leaving defendant and DeAnda in the living room. No one else was in the apartment. Defendant handed DeAnda a bag of cocaine, and the two negotiated a

price of $900. DeAnda then said that he could use at least five to six ounces of cocaine a week; defendant responded that he could supply that amount at a discounted price of $875 an ounce. DeAnda asked how he could get in touch with defendant; defendant told him to contact Walters. DeAnda replied that she was tough to get and gave defendant his pager number. Defendant wrote down the number and said he would use 58 as a code number.

Defendant and "Joe" conversed some more. After they discussed different ways of testing cocaine for purity, defendant asked DeAnda if the latter had a source for marijuana, which was scarce in the area. DeAnda said that he would see if he could find a source. Defendant also told DeAnda that he disliked police, having had a run-in with the Bensenville police in 1977, and was looking for a weapon with a lot of firepower and a limited amount of noise. DeAnda replied that he had a source for machine guns but would have to check on availability. Defendant said that he would page DeAnda at about 6:30 p.m. Tuesday, July 18.

On Tuesday, defendant paged DeAnda. DeAnda called defendant and told him that he needed two more ounces of cocaine. He also told defendant that the "sewing machine" (machine gun) had come in, but that he had not found a source of marijuana. Defendant replied that two ounces of cocaine would be no problem.

That day DeAnda received a circuit court order permitting him to tape-record his conversations with defendant. The jury heard tapes of these conversations, and transcripts of the tapes are part of the record on appeal. On Wednesday, July 19, at about 7:10 p.m., defendant paged DeAnda, leaving DeAnda the phone number of defendant's fiancee, Marian Anderson. DeAnda called the number and spoke with defendant. Defendant recalled that DeAnda's "order was due" and asked if DeAnda had called Walters; DeAnda replied that he had, but only got the answering machine. Defendant replied, "that's all I got, too," and asked if DeAnda had brought the "sewing machine." DeAnda said that he had. The two then discussed a meeting place. Defendant suggested the intersection of Waveland and Irving, where he "used to pick up a lot of stuff," as the area was "nice and secluded." DeAnda suggested a busier place, the parking lot at Dominick's at the corner of York and Grand. The two agreed to meet there at about 8:30. They also agreed on the sale of two ounces of cocaine for "the same amount," in DeAnda's words, with defendant adding, "when you can go for more then we'll see what happens."

When the two met as planned that evening, defendant handed DeAnda a rolled-up T-shirt; DeAnda unrolled it and found two bags,

each containing one ounce of cocaine. DeAnda mistakenly handed defendant $1,900, and defendant gave back the extra $100. DeAnda showed defendant the "sewing machine" and silencer, which the two examined and discussed. Defendant told DeAnda he wanted to talk to a friend to make sure that it was legal; apparently reassured that it was, he counted out $1,000 for the gun. DeAnda informed him, however, that his friend would not sell the gun except as part of a "package deal" including 25 pounds of marijuana at $800 per pound. Defendant said that he would need to see a sample of the marijuana. DeAnda asked if defendant could trade cocaine for marijuana; defendant replied that he probably could do so at a good price and would talk to his source.

Defendant paged DeAnda Thursday evening, July 20. DeAnda called back the same number as before. The conversation was not recorded, DeAnda testified, because he had not brought his recording equipment home with him. Defendant told DeAnda he needed a sample of marijuana to test for quality; DeAnda replied that he would check with his source. Defendant agreed to get back in touch the next day.

Defendant's number 58 activated DeAnda's pager the next day; DeAnda called at about 6:50 p.m. Anderson told him to call back.

DeAnda called back Friday, July 22, and Anderson told him that defendant had told her to call DeAnda to find out if "he could get a sample" and if DeAnda could "do it tonight." Defendant then spoke to DeAnda, explaining that he had paged the latter about a dozen times the previous evening, as planned, but had gotten no answer. DeAnda related that his source had shown him the marijuana and had agreed to let defendant examine it and sample some. The two discussed, at some length, possible deals; defendant eventually informed DeAnda that his source was interested in a "straight up trade" of 25 ounces of cocaine for 25 pounds of marijuana.

Defendant also asked about the "sewing machine." DeAnda offered to sell it for $900, but agreed to bring the price down to $800. DeAnda said he would let defendant sample the marijuana; defendant replied that he wanted to be cautious because his source had been telling him that there was some "stuff" going around that looked and smelled good but would not "get you to where you want to go." The two negotiated some more, with DeAnda offering to add some cash if defendant would come up with a kilogram (36-ounce) "brick" of cocaine. Each agreed to discuss matters with his source.

Defendant paged DeAnda a few minutes later. DeAnda called back and told defendant that his source wanted a simple "straight

up" deal. Defendant agreed. DeAnda said that that day would not be a good one for him to do the deal because he was "in the doghouse." Defendant asked him if the "old wifey-poo" was mad. DeAnda explained that he was not married, but his girlfriend was angry at him. DeAnda and defendant agreed to meet Monday evening. DeAnda also agreed to bring along the "sewing machine." Defendant expressed great interest in "something with one of those things on the end of it," agreeing with DeAnda's comment that the gun was for a "somebody done you somebody wrong song." DeAnda agreed to let defendant check out the marijuana; neither liked the feeling he got from marijuana, but defendant explained that others did, including people "down south" that he had interested. These others could make "this *** a big time on-going thing." Defendant agreed to call DeAnda about 6:30 p.m. Monday.

The two spoke by phone Monday as planned, and at about 8:40 p.m., defendant and his brother arrived at the Dominick's parking lot. Defendant got out of his car, exchanged greetings with DeAnda, and walked to DeAnda's truck to inspect the marijuana. Defendant asked if it was "Sense or what?" and DeAnda replied that it was not Sensimillia but came from Mexico. Defendant inspected the marijuana. Defendant also asked about the "sewing machine" and explained he had brought no cash; DeAnda said he could not let it go without cash, and defendant agreed to "do it next time."

Defendant then told DeAnda that he had checked DeAnda's license plates "because I have friends in a lot of places and this [truck] isn't registered to you." DeAnda insisted that the truck was his and told defendant that he could show him the registration. Defendant, indicating that he was reassured, walked back to his car and brought over a package containing 700.60 grams of cocaine. At that point DeAnda activated an arrest signal. Police arrived, arrested defendant, and pretended to arrest DeAnda. Defendant was taken to the Bensenville police station.

DeAnda opined that 770 grams of cocaine would have a street value of $70,000 to $210,000. He admitted on cross-examination that this estimate assumed that the cocaine would be sold in small amounts; the amount that he got from defendant would sell for a bulk rate of $700 to $1,200 per ounce, or $17,500 to $30,000 overall.

On cross-examination, DeAnda reiterated that he had never met Jeanine Walters before July 12, 1989, and that to his knowledge she had not been involved with DuMEG before then. She did not tell him that she was a regular cocaine user or cocaine addict. DeAnda first testified that he found out some time after the initial interview that

she had been in a drug rehabilitation program. After examining the informant sign-up sheet, however, DeAnda stated that Walters had told him this at the first interview.

When he signed Walters up, DeAnda and Walters went over the guidelines for informants. The guidelines forbid informants to sell or deliver or cause the sale or delivery of any controlled substance, to use their sexuality to induce anyone to sell or deliver a controlled substance, or to engage in activities constituting entrapment. DeAnda expected Walters to abide by the guidelines. To the best of his knowledge, Walters was not impaired or intoxicated at the interview. DeAnda testified on cross-examination that he made mental notes, but no written notes, of the July 12 interview. However, on redirect he explained that he recorded a two-page personal history report on Walters and took a half page of additional notes on a "debriefing sheet."

DeAnda admitted that the July 14 meeting at Walters' apartment was the only time he was present at a conversation between Walters and defendant. He did not know whether any conversations between Walters and defendant between July 14 and July 24 were recorded and did not listen in on any such conversations. However, DeAnda did not believe that defendant talked with Walters between July 14 and July 18, as defendant told him on July 19 that he, like DeAnda, had tried to contact Walters and had gotten only her answering machine. DeAnda conceded that telephone records, later admitted into evidence, showed calls between Walters and the number at which DeAnda had called defendant; this number, however, was for Marian Anderson's apartment, not defendant's house. Although DeAnda did not know whether defendant contacted Walters after July 18, DeAnda testified that after that date defendant arranged all of his drug deals directly with DeAnda.

DeAnda lost track of Walters late in 1989, after she attempted without success to work on another case. DeAnda did not know where she lived at the time of trial and had not looked for her. In March 1990, after police investigators discovered that Walters was living at the Tokyo Inn in Schiller Park, Walters paged DeAnda and told him that she had changed her telephone number because someone from defendant's family was harassing her.

Walters set up the July 14 meeting with defendant. This was the first time DeAnda met defendant. It was DeAnda's idea to have defendant page him rather than setting things up through Walters. To DeAnda's knowledge, defendant did not have a pager. In DeAnda's experience, however, some drug dealers had pagers and some did not.

Defendant's call to DeAnda on July 18 did not, unlike the other calls, come from Marian Anderson's apartment. DeAnda denied that defendant on that occasion told him that he was calling from the Catholic Charities building in Chicago, where defendant was receiving an award from the Chicago police. DeAnda further denied that defendant, during this call, told him that he did not want to go through with the drug deals. When cross-examined about the July 22 conversation, DeAnda stated that he never told defendant that he had a wife, but did not know if Walters had said so to defendant. Walters told DeAnda that she had told defendant that DeAnda was not her boyfriend.

Officer John Bright, a DuMEG agent who helped to arrest defendant, testified that defendant, after being given his *Miranda* rights at the station, explained that he had had a problem with cocaine in the past, had squandered a $100,000 inheritance on cocaine and on his friends, and that he was just attempting to make back some of the money he had lost to cocaine. Defendant added that watching "Miami Vice" on television had made it look easy. On cross-examination, Bright admitted that defendant's statement had not been recorded and that the police had not asked defendant to write anything out.

Steven Dahl, a detective with the Du Page County sheriff's office, also participated in the interview at the police station. His testimony corroborated Bright's. Dahl recalled that during the interview, defendant never brought up Jeanine Walters' name. Defendant did state that he had been "straight" for two months, and defendant did not appear to be under the influence of cocaine or any other drug at the time.

Jeanine Walters did not testify. Thomas Pope, an investigator with the Du Page County State's Attorney's office, testified that on March 8, 1990, at the request of the assistant State's Attorney assigned to this case, he served Walters with a subpoena at the Tokyo Inn in Schiller Park. The State's Attorney's office had since tried unsuccessfully to find out Walters' address from her employer. Pope attempted to serve her with a subpoena at the Tokyo Inn on the morning of the trial; employees of the motel told him that she had moved in March or April without leaving a forwarding address.

Defendant's witnesses were himself and Michael Toomey, Bensenville chief of police. Chief Toomey testified that after he learned of defendant's arrest, he issued, as part of his regular duties, a press release stating that the arrest culminated a two-month investigation by DuMEG and the Illinois State Police. This information was published in the Chicago Tribune. On cross-examination, Toomey acknowledged

that he was not privy to information about when DuMEG begins its investigations and did not supervise Officer DeAnda's daily activities with DuMEG. However, on redirect, Toomey stated that his information about the length of the investigation came from the director of DuMEG, who was aware of such information and did supervise DeAnda.

Defendant testified that he was born in Tennessee and moved to Chicago at age six. After graduating from high school, he started but did not complete college. At the time of his arrest, he was a warehouse manager for a local building materials company.

Defendant explained that he started using cocaine in 1980, about three years after graduating from high school. He used cocaine casually until he became addicted in 1988. At his tenth high school reunion in 1987, he met Marian Anderson, now his fiancee. Defendant eventually moved in with Anderson and lived with her until February 1989, when he took possession of a nearby house that he had bought with part of a $93,000 inheritance he had received when he turned 30 in August 1988. Defendant and Anderson got into the habit of buying cocaine for each other; soon, both became addicted. Defendant did not sell cocaine to others, but regularly bought it in small amounts for personal use.

Defendant and Anderson decided that they needed to break their habits. They made a pact to quit. Anderson entered the Parkside Drug Rehabilitation Center on April 24, 1989. Defendant quit on his own. At the time of his arrest, he had gone without cocaine for slightly over two months. Joseph DeAnda was the only person to whom defendant was selling cocaine after he quit using it.

At Parkside, Jeanine Walters was Anderson's roommate. As was customary in the program, the roommates became very close friends. Defendant visited Anderson about 15 or 20 times in Anderson's initial month at Parkside; Walters was present each time. The first time defendant met Walters, she asked him if he had brought cocaine. Defendant said no. Six or seven times thereafter, Walters asked defendant to get her cocaine. Each time defendant refused, telling Walters that would defeat the purpose of the program. Walters once ran her fingers through defendant's hair and told him that she had been a hooker in Las Vegas. However, defendant never felt sexually attracted to her.

Anderson left Parkside on May 23, 1989, after she used cocaine on a weekend pass, and went to a sister facility in San Antonio, Texas. Before Anderson left, Walters gave defendant a self-addressed envelope, later introduced into evidence at trial, and asked defendant

to put some cocaine in it and mail it to her. Walters told defendant that she would get out of Parkside in two days and was still going to use cocaine. Defendant refused Walters' request and threw the envelope into a desk in his house instead.

While Anderson was away in San Antonio, Walters called defendant five or six times, each time asking him to get cocaine for her. Defendant refused each time. On July 8, Anderson returned and defendant picked her up. The two went to defendant's house, where he received a phone call from Walters. Walters told him that one of her boyfriends, "Joe," was interested in purchasing cocaine. Defendant replied that he did not deal and refused the request. Walters and Anderson then talked. On July 9, Walters again called and asked defendant to use his source to get her cocaine. Again, defendant refused.

On July 14, defendant finally agreed to get cocaine for the man he later learned was Officer DeAnda. Walters called him that day and told him that her boyfriend Joe was desperate because dealing was his whole living, his connections had no drugs, and he, along with his wife and daughter, were close to going on welfare. Walters was desperate because she, too, had large bills to pay; defendant had seen her throw several of these bills into the garbage at Parkside. Walters then spoke with Anderson for about a half hour. Defendant initially did not want to supply Walters with cocaine, but Anderson changed his mind by telling him that Walters was a friend, so it would be all right. Defendant spoke to Walters and received directions to her apartment. Defendant testified that he would not have agreed to the transaction had not Walters and Anderson, the former playing on her close relationship with defendant's fiancée, talked him into it. Walters initially asked defendant to supply an ounce of cocaine, more than he had previously ever bought at one time. Defendant's understanding was that he would supply Joe with cocaine until Joe's connections could resupply themselves.

Defendant had never talked to DeAnda before their July 14 meeting. When they met for the first time, defendant was scared of DeAnda, as Walters told him that "Joe" could be mean when he had to be. Also, defendant was frightened by the tattoos on both of DeAnda's arms. DeAnda paid defendant $900 as earlier arranged; as defendant had paid his source $600, he made a profit of 50%. Although defendant really did not want to continue the relationship, DeAnda insisted on giving him his pager number; because he feared DeAnda, defendant did not give DeAnda his phone number, but told DeAnda to get in touch with Walters if he needed to reach defendant.

DeAnda left about an hour after defendant and Anderson arrived. After he left, Walters not only thanked her two guests for helping "Joe," but brought out some cocaine and started using it. Defendant had no idea where Walters obtained the cocaine. Defendant and Anderson stayed for a while, watching television and conversing with Walters, then went home.

After trying to call Walters and receiving only messages on her answering machine, defendant, on July 18, paged DeAnda. At the time, defendant was at the Catholic Charities building in Chicago to receive a certificate of commendation (admitted into evidence) from the Chicago police department. Defendant received the award for helping police officers physically apprehend a man suspected of murder and several armed robberies and purse snatchings. According to defendant, he told DeAnda that he did not want to deal with DeAnda any more. DeAnda reminded defendant that he had promised Walters to supply DeAnda until DeAnda's supplier received more cocaine. Defendant then agreed to DeAnda's request to obtain two more ounces of cocaine. DeAnda told defendant to page him the next day. Defendant testified that despite his reluctance to deal with DeAnda, he felt pressured and scared because Walters had defendant's address and phone number, and defendant was afraid of what DeAnda might do if defendant backed out.

Defendant went through with the deal as planned. He used drug dealers' argot because DeAnda liked it and because Walters had told him to play the role of a drug dealer when talking to DeAnda.

On the night of Saturday, July 22, defendant and Anderson went to Walters' apartment after Walters had invited them over to "party" with her. Defendant and Anderson stayed two or three hours. Defendant told Walters about his conversation with DeAnda earlier that day. Walters told him to go through with the deal because "Joe" was "okay." On July 24, defendant called Walters twice, telling her that he was afraid of going through with the transaction and that he wanted to find out more about DeAnda first. Walters assured him that DeAnda was "okay," that this was probably the last deal defendant would have to do, and that "something might happen" to defendant if he backed out.

After his arrest, defendant told the police that he had been "clean" for two months. He also mentioned his inheritance, all but about $10,000 of which he had gone through by the time he was arrested. Defendant testified that he did not tell the police about Jeanine Walters because at that point he still believed she and "Joe" were his friends and he did not want to implicate either one. Defend-

ant also testified that he became interested in the machine gun because it would be a "neat toy," but did not buy the gun from DeAnda because a friend told him it would be illegal.

On cross-examination defendant stated that he paid his source $600 for the ounce of cocaine that he sold DeAnda on July 14 and $1,200 for the two ounces he sold DeAnda July 19. Defendant conceded that his sympathy for DeAnda's economic woes did not prevent him from making a profit of $300 per ounce, or 50%, on these deals. He also admitted that his profit per ounce equaled a week's take-home pay. Even though defendant himself had used gram amounts of cocaine, his source willingly provided him with larger amounts; moreover, defendant's source trusted him enough to "front" him 25 ounces of cocaine for the July 24 trade. Defendant testified that he did not anticipate making money off this trade, but intended to take the marijuana back to his source so that his source could sell it. However, defendant did not deny telling the police after his arrest that he saw selling drugs as an easy way to recoup some of the money he had spent on his cocaine habit. He did not mention helping "Joe" pay his bills as one of his reasons for dealing with DeAnda.

When he agreed to sell drugs to "Joe," defendant did not know how long it would be until DeAnda's sources would be resupplied with cocaine. Walters never told defendant when or how often to call DeAnda, and defendant took the initiative in getting in touch with DeAnda on July 18, 19, 20, 22 and 24. Although defendant feared DeAnda threatening him if he backed out, DeAnda not only did not initiate these contacts but never called or visited defendant even though he could have obtained defendant's address and number from Walters. Defendant denied that his calls to Walters July 24 arose from his fears that DeAnda might be an undercover policeman; although his check of the license plates on DeAnda's truck had convinced defendant that DeAnda was lying to him, it did not cross defendant's mind that DeAnda might be a policeman.

After meeting "Joe" on July 14, defendant and Anderson stayed at Walters' apartment long after DeAnda left, even though Walters was using cocaine and defendant was concerned about his and Anderson's susceptibility to the drug. Similarly, defendant and Anderson visited Walters on July 22 and stayed while Walters used cocaine even though he knew it meant exposing both of them to cocaine abuse.

Defendant testified that after he sold DeAnda two ounces of cocaine on July 19, he counted out the $1,000 for the machine gun only because he felt obligated after DeAnda told him how scared he had been transporting the gun to the parking lot. According to defendant,

much of what he told DeAnda in their recorded conversations was bluffing. He never really believed that their deals could be a "big-time, ongoing thing" and never had any customers "down south" for the 25 pounds of marijuana he received.

The parties stipulated that, if called, Joseph DeAnda would appear before the jury, raise both shirt sleeves and show that he had a single tattoo, on his right arm.

The jury convicted defendant on both counts. The trial judge, stating that he agreed with the jury that defendant had not been entrapped, subsequently denied defendant's post-trial motion and sentenced defendant to concurrent terms of 6 and 15 years' imprisonment, plus fines. Defendant now appeals.

Defendant argues that the State did not prove beyond a reasonable doubt that he was not entrapped into the offenses of which he was convicted. Defendant emphasizes that because Jeanine Walters did not testify, his account of Walters' attempts to induce him into dealing with Joseph DeAnda is uncontradicted and shows that, as a matter of law, the State's agent persuaded an otherwise unpredisposed individual to become involved in illegal activity. The State replies that, from the evidence, the jury could have found that defendant eagerly and aggressively pursued what he saw as a lucrative opportunity, that he participated in his deals with DeAnda as a sophisticated and well-connected businessman, and that governmental agents merely encouraged him to follow his own criminal bent. We believe that the State has the better argument and that defendant was not entrapped as a matter of law.

A reviewing court will not set aside a guilty verdict as long as the evidence, viewed in the light most favorable to the prosecution, is sufficient for any rational trier of fact to conclude that the essential elements of the offense have been proved beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) Once a defendant raises the affirmative defense of entrapment (Ill. Rev. Stat. 1989, ch. 38, par. 7—12), the State must prove beyond a reasonable doubt that the defendant was not entrapped. (*People v. Cross* (1979), 77 Ill. 2d 396, 401.) However, the question of entrapment is ordinarily for the jury, unless a court can find entrapment as a matter of law. *People v. Ferro* (1990), 195 Ill. App. 3d 282, 289.

Entrapment is established when governmental officials originate a criminal design, implant in the mind of an innocent person the disposition to commit the offense, and induce the commission of the offense in order to obtain evidence in order to prosecute that person. (*People v. Keen* (1990), 206 Ill. App. 3d 940, 947.) Entrapment is not available

as a defense where governmental agents merely afford a person predisposed to committing a crime the opportunity to do so, or merely aid and encourage such a predisposed person to commit the offense. (*People v. Tipton* (1980), 78 Ill. 2d 477, 488; *People v. Gaytan* (1989), 186 Ill. App. 3d 919, 925.) Factors relevant to assessing a defendant's predisposition to commit a drug-related offense include the defendant's initial reluctance or willingness to commit the crime, the defendant's familiarity with drugs and his willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's prior or current use of drugs, whether the defendant had ready access to a drug supply, and the defendant's prior criminal record or lack of same. *Keen*, 206 Ill. App. 3d 940.

With these standards in mind, we see no reason to disturb the jury's determination that the defendant was not entrapped into either the July 19 cocaine sale or the July 24 cocaine-for-marijuana swap. Defendant claimed to be a newcomer to selling drugs. However, the jury was entitled to take into account his admission that he was a heavy drug user (and purchaser) for almost a decade until shortly before his arrest and that he therefore had access to supplies of cocaine. See *Keen*, 206 Ill. App. 3d at 949; *People v. Schillaci* (1988), 171 Ill. App. 3d 510, 518.

The record shows, in fact, that defendant was able to procure large amounts of the drug for $600 per ounce. Although defendant testified that he had previously bought only small amounts of cocaine for personal use, the evidence was undisputed that he was able to procure amounts far in excess of those intended only for personal use and that he was able to obtain this cocaine at bargain prices. Defendant himself told DeAnda that he would have no trouble supplying five or six ounces per week at a discount to DeAnda. Most strikingly, defendant's source willingly "fronted" him 700 grams of cocaine worth at least $17,500 (more if sold in small amounts). Also, defendant's assertion that he was new to drug dealing was dubious given that he took the initiative in trying to obtain marijuana from DeAnda and eventually received 25 pounds of it. Defendant engaged in extensive negotiations of the deals, which the jury heard by listening to the audiotapes. During these taped negotiations, defendant revealed his familiarity with jargon from the cocaine and marijuana trades.

Furthermore, the evidence was strong that defendant, far from entering either transaction hesitantly, eagerly pursued DeAnda's patronage for the sake of quick and substantial profits. Defendant paged DeAnda a total of 18 times within a period of 12 days to arrange drug sales. Defendant's statement to the police that he engaged in the

deals to make money is corroborated by his 50% profit on the July 14 and July 19 cocaine sales. Defendant also took the initiative in arranging with DeAnda to obtain marijuana for resale. The jury could conclude from the audiotapes of the negotiation that he did so in hopes of further business success. It was also defendant's idea to ask DeAnda to find him a machine gun with a silencer, an idea that defendant pursued to the point of counting out the money to pay for the gun. Although defendant was not on trial for attempting to purchase the marijuana or the gun, the jury could view his initiative in pursuing these items of contraband as grossly inconsistent with his attempted self-portrayal of a well-meaning innocent who entered into his criminal activities only reluctantly after psychological pressure.

Under these circumstances, the jury did not have to accept defendant's version of why he entered into dealing with DeAnda. Although defendant argues that the failure of the State to call Jeanine Walters makes his version of Walters' actions in inducing his offense undisputed, other evidence at trial gave the jury good reason not to give too much weight to defendant's account. That defendant was reluctant to provide Walters with cocaine inside a rehabilitation facility does not establish that he was not predisposed to sell large amounts at a high profit to DeAnda later on. Defendant's "good samaritan" version of why he made the initial sale to DeAnda is not altogether plausible in view of the substantial profit that he made, his initiative in seeking marijuana and weaponry from DeAnda, and his continuing deals with DeAnda after he found out that "Joe" owned a truck ostensibly used in business and was probably not the destitute family man that Walters portrayed.

Moreover, even if the July 14 deal was induced by Walters as defendant argues, the jury would not be required to find that the subsequent transactions were the product of that inducement. Whether an initial entrapment continues through a series of criminal transactions is a factual question for the jury. (*Gaytan*, 186 Ill. App. 3d at 925; *People v. Washington* (1987), 154 Ill. App. 3d 648, 653; *People v. Estrada* (1980), 91 Ill. App. 3d 228, 234.) Here the jury could reasonably conclude that even if defendant reluctantly entered the first transaction, he willingly embarked on the later transactions once he saw how profitable doing business with "Joe" could be.

The jury was also not compelled to believe defendant's testimony that he kept dealing with DeAnda because he was afraid of the consequences if he stopped. Defendant did not mention this explanation to the police, instead emphasizing financial motivations. Moreover, there is no evidence that "Joe" threatened defendant, called defendant at

the latter's home, or even took very much initiative in arranging the number or size of the sales. The jury could find defendant's hesitancy to go through with the final deal explicable only out of his fear that he would be caught by the police, despite defendant's denial that he ever suspected that DeAnda might be an officer. Where the evidence shows that a defendant had ready access to drugs, which he sold for the sake of a profit, the jury is not required to disregard this evidence in favor of the defendant's assertion that he felt compelled to engage in such persistent and lucrative behavior. See *Ferro*, 195 Ill. App. 3d at 290; *People v. Beavers* (1986), 141 Ill. App. 3d 790, 795.

Defendant invokes certain cases where a conviction was reversed on appeal based on entrapment. In each case, however, unlike the instant case, the State did not present evidence of defendant's predisposition. (*People v. Poulos* (1990), 196 Ill. App. 3d 653 (defendant had no previous experience with drugs and had no intention of profiting from the sale); *People v. Connor* (1988), 176 Ill. App. 3d 900 (defendant had no prior criminal record, no prior use of drugs, and was induced to find a buyer for police in order to be repaid money loaned to the informer); *People v. Boalbey* (1986), 143 Ill. App. 3d 362 (no evidence of predisposition presented by State at trial).) In that the State presented adequate evidence of defendant's predisposition in this case, the above cases cited by defendant do not apply here.

Upon our review of the evidence elicited at trial, we find no reason to disturb the jury's determination that defendant was not entrapped. And defendant has never denied that the other elements of the two charges were proved beyond a reasonable doubt. The judgment of the circuit court of Du Page County is therefore affirmed.

Affirmed.

WOODWARD and McLAREN, JJ., concur.