THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES LANDWER, Defendant-Appellant.
Second District   No. 2—92—0232

Opinion filed December 29, 1993.

DOYLE, J., dissenting.

G. Joseph Weller, Ingrid L. Moller, and Paul J. Glaser, all of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers, Mary Beth Burns, and Norbert J. Goetten, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

The defendant, Charles Landwer, was charged by indictment on January 9, 1991, with two counts of solicitation of murder for hire.

(Ill. Rev. Stat. 1989, ch. 38, par. 8—1.2 (now 720 ILCS 5/8—1.2 (West 1992)).) He raised the affirmative defense of entrapment. (Ill. Rev. Stat. 1989, ch. 38, par. 7—12 (now 720 ILCS 5/7—12 (West 1992)).) The matter was tried before a jury, which convicted the defendant on November 8, 1991, of both counts. He was sentenced on February 21, 1992, to two concurrent terms of 20 years in prison. The defendant filed a timely appeal, and we now reverse and remand for a new trial.

The defendant, owner of Chuck's Auto, an auto repair and body shop in Hanover Park, was convicted of soliciting the murders of two of his former employees, Aric Cherim and James Haliotis.

Haliotis worked as a mechanic at Chuck's Auto for about a year and a half. The defendant apparently became angry at him because he suspected Haliotis of stealing tools from the shop and sending him threatening letters. Cherim's job was picking up and cleaning cars. He eventually helped the defendant "repossess" vehicles. After taking several cars over a period of months, Cherim said he became convinced that the repossessions were actually thefts. He went to the Du Page County State's Attorney's office on October 12, 1990, and spoke to investigator Lori Chassee, who began an investigation. On October 31, 1990, a 36-count indictment was returned against the defendant, charging him with various automobile offenses.

The defendant testified he became angry when he learned that Cherim had spoken to the State's Attorney's office and wanted to scare him. The defendant claimed that he originally intended to have Cherim and Haliotis injured and only acquiesced to murder for hire after repeated prodding by the person he thought was a "hit man" but who turned out to be Robert Holguin, an investigator with the Du Page County State's Attorney's office.

The defendant was introduced to Holguin by Chris Bowden, who testified that he began repossessing cars with the defendant in July 1990. Bowden testified that after the defendant was arrested in connection with the alleged thefts, the defendant called him and told him to keep silent if anyone asked him about their repossession business. Bowden said that on November 16, 1990, the defendant told him that Cherim had talked to the State's Attorney's office and asked Bowden if he "had a problem with Aric [Cherim] being taken out." Bowden said he told the defendant that he did not want to talk about it. Bowden said that several days later, the defendant told him he would "get him," referring to Cherim. Bowden said the defendant told him that he knew where Cherim's girlfriend worked and then said that Martin Luther King "would still be alive today if he would have just learned to keep his mouth shut." Bowden said he then became frightened and

called the State's Attorney's office on November 18; he told Chassee that the defendant planned to kill Cherim.

Bowden also testified that on December 11, the defendant told him that Cherim was "a dead man, just like anybody else who talks," and claimed that he (the defendant) had some friends "working on it, and when Aric isn't looking over his shoulder, he is going to hit him." On December 19, Bowden said, the defendant asked him to befriend Cherim so that police would not suspect Bowden if Cherim "had an accident." Bowden said he then called Chassee and consented to assist in eavesdropping of phone calls with the defendant.

On December 21, Chassee secured an eavesdropping order from a Du Page County judge. Bowden was the consenting party and agent for the effort, and the defendant was the target of the eavesdrop. Later that day, Bowden, with Chassee present, made the first of a series of tape-recorded telephone calls to the defendant. All of the recordings were entered into evidence at trial and were played in open court.

A tape-recorded call was placed from the State's Attorney's office on December 22, during which the defendant was heard to tell Bowden that the defendant knew a man named "Barbecue Jerry" who had "some friends who could help some of our friends have a change of attitude."

A call made December 26 included a passage in which the defendant again referred to Barbecue Jerry:

"LANDWER: Well, he's got some people who are going to, you know, turn—change people's mind, you know, did you ever steal a cookie when you were small and your mother slapped your hand?

BOWDEN: Right.

LANDWER: Well, that's exactly what's gonna happen."

The first call involving investigator Robert Holguin was placed by Bowden from the De Kalb police department on December 28. Holguin testified that prior to this call he instructed Bowden to tell the defendant not to trust Barbecue Jerry but instead convince him that he knew of a more reliable "hit man." Bowden complied, and the following conversation ensued:

"BOWDEN: Well this [new] guy [Holguin] will probably come through, you know? Well what exactly do you want to do? This guy makes people gone, like that's what we're talking, right?

LANDWER: I thought a severe beating would be sufficient because then if it ever filtered down to us.

BOWDEN: I want to track down Aric.

LANDWER: We'd like to see seven days in the nice hospital.

BOWDEN: In the next seven days?

LANDWER: No, we'd like to see them spend seven days in the hospital.

BOWDEN: Oh, O.K., I see.

LANDWER: You know a couple of broken legs is fine, something you can't you know [*sic*].

BOWDEN: Well, I was thinking.

LANDWER: Uh, you were unless you want to have it gone, that would be fine, too.

BOWDEN: Well, that's what I assumed, I mean.

LANDWER: I would lose no sleep over it, would you?

BOWDEN: No, no.

\* \* \*

LANDWER: Yeah, call the guy, get the story, and then if he wants like a nickel [$500] apiece, yeah, we can do that.

BOWDEN: That's probably what he'll want.

LANDWER: That's no problem, I mean, he'll get the job done.

BOWDEN: Yeah, I'm like, I'm pretty confident. I wouldn't have told you about it if I didn't think so.

LANDWER: Gone might be better.

BOWDEN: What's that?

LANDWER: Gone might be good.

BOWDEN: Well, that's kind of like what this guy does, I mean, that's what I, you know, mean that's my motivation for getting him.

LANDWER: All I think is that this has got to come to a grinding halt. The stories have to be stopped today."

Bowden next called the defendant on January 2, 1991, to tell him that his "hit man" wanted $600 for each person they wanted taken care of. The next day, Bowden called the defendant to make arrangements to have him meet with himself and the hit man, Holguin. The defendant was very reluctant and urged Bowden to handle the arrangements himself. After Bowden told him the hit man would only take the job if he met the defendant personally, the defendant agreed to the meeting, which was held later that day in the parking lot of a fast-food restaurant. During that meeting, in which Holguin was fitted with a recording device, the following conversation ensued:

"HOLGUIN: O.K. Well, I mean, what kind of an end do you want?

LANDWER: Whatever you feel comfortable, you know, you know. Whatever you think is a ... (inaudible).

HOLGUIN: Well, you know. I'll tell you. You're paying for it man, I mean, you're the one, I mean, this guy's gonna be pissed off cause, you know, you bang him up a little. Is he gonna, is it gonna piss him off more, I mean, what do you want?

LANDWER: I don't know.

HOLGUIN: What do you want, I mean.

LANDWER: What do you think, Chris? What do you think? Put an end to this problem once and for all?

BOWDEN: I thought that was your understanding. You know, that's kind of what I led him to believe.

LANDWER: That's fine.

* * *

HOLGUIN: O.K. The problem is, what do you want done, I mean.

LANDWER: Well, I mean, what do you think it will take to keep the kid quiet? What do you think, Chris, do you just want to get rid of it?

BOWDEN: Well you talked, that's what I assumed you were talking about.

LANDWER: I think that's best and the least problems.

* * *

HOLGUIN: You know, obviously it's a lot easier to just hit him. I mean, it depends on what you want.

LANDWER: That's probably the best, just...

HOLGUIN: You know, you, know, they find him, you know, you know, he got somebody pissed, you know, he got in a fight somewhere, boom, somebody just, you know, just blew him away or something.

* * *

HOLGUIN: So you want him dead?

LANDWER: If the story stops, we'll know quick enough if the stories stop, you know what I'm saying.

* * *

HOLGUIN: O.K. So what do you want done with this guy, obviously, do you want a broken leg, I mean do you want me to shoot him, or what? Once in the head, what? I don't want no misunderstandings, guy, O.K? Cause I don't want you to come back later at me, well, not, I just, you know, wanted this guy hurt. I mean, tell me exactly what you want.

LANDWER: Do you think it's gonna solve our problems, Chris? Yes or no?

BOWDEN: A hurt body still has lips.

LANDWER: Yeah, see, I think that will just piss him off more. What do you think?

HOLGUIN: Well, my experience is yeah, you know, then he's gonna really be pissed off at you, but it's up to you.

LANDWER: I mean, the kid goes ... four-wheeling, the kid goes some places, you follow the kid around for a half, a couple hours, I mean, you know.

HOLGUIN: Well, O.K. That's fine. I mean, but what do you need done? What do you exactly want done to him?

LANDWER: Shut the kid up somehow, shut him up and be done with it. I don't care whatever it takes, he keeps telling story after story.

HOLGUIN: Do you never want him to talk again?

BOWDEN: Why is this so weird? I mean, isn't this what we talked about on the phone, Chuck?

LANDWER: Yeah, just do that. Finish the kid and be done with it, O.K.? That's the best."

During that same conversation, the defendant and Holguin discussed "the other guy," and the defendant said the person was Jim Haliotis. They agreed that the defendant would pay Holguin $300 in advance for each job and $300 each after Holguin had completed his work. The defendant gave Holguin $300 for the attack on Cherim and then left.

The following day, January 4, Holguin called the defendant and they agreed to meet again. During that meeting, the defendant gave Holguin a description and address for Jim Haliotis. The following exchange was recorded:

"HOLGUIN: So, you all set for this weekend? I mean, I mean, I'm gonna kill these guys, you know? These guys are gonna be dead.

LANDWER: I'll get the cash, I know."

Holguin gave a predetermined signal to the police, who arrested defendant.

Amy Gillette, a friend of the defendant and Bowden who said she had dated the defendant for about a year, testified that late in November 1990 Bowden told her that "he was going to get everything he could out of Chuck [the defendant] before Chuck was put away," and that "information was the best thing to have against someone." She also testified that the defendant had never told her he wanted

someone killed but did tell her that Aric Cherim was "going to have a real bad accident."

Jerry Raymond testified at trial that his nickname is "Barbecue Jerry" and that in November or December 1990 he called the defendant to seek a loan. He said the defendant asked him if he knew "anybody that can rough up a couple of punks" for him. Raymond said that he did, but the defendant never asked him to act on the request.

The defendant testified that Bowden originated the idea of killing Cherim and first mentioned the idea in their taped phone conversation of December 28. At that time, the defendant testified, he thought such a plan was extreme and unnecessary. The defendant said that by late December he no longer considered Cherim a threat because Cherim had told prosecutors all he could about the stolen car business and "there wasn't much dirt left."

The defendant denied telling Bowden to find someone to kill Cherim and claimed that he met with Holguin only because Bowden insisted repeatedly. The defendant said that Holguin originated the idea of killing Haliotis and that he finally agreed to have Cherim killed midway through the January 3 meeting with Holguin and Bowden. The defendant said that on January 4, when he met with Holguin alone, he had at last developed the intention to have Holguin kill both Cherim and Haliotis.

Entrapment is an affirmative defense. (Ill. Rev. Stat. 1989, ch. 38, par. 7—12 (now 720 ILCS 5/7—12 (West 1992)).) To raise the defense, a defendant must first admit guilt as to the underlying crime. (*People v. Gillespie* (1990), 136 Ill. 2d 496, 503.) Once raised, the prosecution has the burden of proving beyond a reasonable doubt that defendant was not entrapped. (*People v. Cross* (1979), 77 Ill. 2d 396, 401; Ill. Rev. Stat. 1989, ch. 38, par. 3—2(b) (now 720 ILCS 5/3—2(b) (West 1992)).) Consistent with these principles, the defendant admitted that he solicited the murders for hire of Aric Cherim and James Haliotis when he interposed the entrapment defense. The trial court gave the entrapment instruction:

> "It is a defense to the charge made against the defendant that he was entrapped, that is, that for the purpose of obtaining evidence against the defendant he was incited or induced by a public employee and/or an agent of a public employee to commit an offense.
>
> However, the defendant was not entrapped if a public employee and/or an agent of a public employee merely afforded to the defendant the opportunity or facility for committing an offense in furtherance of *a criminal purpose which the defendant*

*originated."* (Emphasis added.) See Illinois Pattern Jury Instructions, Criminal, No. 24—25.04 (2d ed. 1981).

The defendant proffered a jury instruction on a lesser included offense of solicitation to commit aggravated battery for hire. The instruction was rejected by the trial court on the theory, advanced by the State, that because the defendant had admitted soliciting murder as a prerequisite to pleading entrapment, the defendant could not have a lesser included offense instruction because it would be inconsistent to admit a greater crime of soliciting murder and be found guilty of soliciting the lesser crime of aggravated battery.

During final argument the prosecution made several references to the entrapment defense, which brought objections from defense counsel on the theory that the prosecutor had misstated the law. These objections were overruled. After beginning its deliberations, the jury asked the judge for a definition of the word "originated" as it relates to the entrapment instruction. The judge refused the request. Some time later, the jury asked for a dictionary. That request was also refused. The jury found defendant guilty of both counts of solicitation of murder for hire, and the defendant was sentenced to two concurrent prison terms of 20 years.

The defendant alleges four errors at trial that require his convictions to be overturned: (1) the trial court refused his instruction of a lesser included offense of solicitation to commit aggravated battery; (2) the prosecutor made misstatements of the law during closing argument that caused material prejudice to defendant; (3) the trial court improperly refused the jury's requests for a definition of the word "originated" as it pertained to the entrapment instruction; and (4) the prosecution failed to prove, beyond a reasonable doubt, that the defendant was not entrapped to commit solicitation of murder for hire.

Because we find that the prosecutor's comments during closing argument caused sufficient confusion as to the proper standard of proof for entrapment and the trial court should have given the lesser included instruction, we reverse the trial court's decision and remand this cause for a new trial.

Entrapment is generally a question for the jury (*People v. Tipton* (1980), 78 Ill. 2d 477, 487), and a conviction will not be set aside unless the evidence at trial is so improbable or unsatisfactory that it creates a reasonable doubt of guilt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) A conviction will be reversed if a prosecutor's improper comments constitute a material factor in the conviction or result in substantial prejudice to the defendant. (*People v. White* (1985), 134 Ill.

App. 3d 262, 278.) In determining whether prejudice occurred, reference must be made to the context of the language, its relation to the evidence, and the effect it had on the rights of the accused to a fair and impartial trial. *White*, 134 Ill. App. 3d at 279.

■ Applying these standards in the present matter, it becomes clear that the prosecutor's remarks prejudiced the defendant. A reasonable doubt exists as to whether the jury would have convicted defendant had it not been for the trial court's failure to correct repeated misstatements of law made by the prosecution during closing argument concerning a pivotal element of the entrapment instruction that was given to the jury.

During its closing argument, the State declared: "[T]he judge will instruct you that induced to commit an offense, the defendant was never induced or incited to have a *severe beating* done on Aric Cherim or Jamie Haliotis." (Emphasis added.) Defense counsel objected, claiming the statement was a misstatement of law. The court overruled the objection.

Later in his argument, the prosecutor said:

> "And the Judge will instruct you, however, the Defendant was not entrapped if a public employee and/or an agent of a public employee merely afforded to the Defendant an opportunity or facility for committing *an* offense in furtherance of *a* criminal purpose which the Defendant originated.
>
> Now, what is the criminal purpose in this case? The criminal purpose is the defendant [*sic*] to shut the witnesses up, to make it come to a grinding halt. This is his purpose. His method is either will be [*sic*] a severe beating or kill them. But the criminal purpose originated with the defendant." (Emphasis added.)

This also brought an objection, and it, too, was overruled.

Error was committed when the prosecutor argued erroneously to the jury, and the trial court failed to correct the error, that the "criminal purpose" sufficient to disprove the entrapment defense in this case could be either the purpose of beating the victim or murdering the victim. This is an incorrect statement of the law and inconsistent with the facts offered at trial. The State was required to prove, in attacking the entrapment defense, that the defendant originated the criminal purpose of soliciting murder, not battery. It is not sufficient for the State to demonstrate that the defendant had *a* criminal purpose; the State had to show he had *the* specific criminal purpose of soliciting murder. (See *Jacobson v. United States* (1992), 503 U.S. 540, 548-49, 118 L. Ed. 2d 174, 184, 112 S. Ct. 1535, 1540 ("Where the Government has induced an individual to break the law and the de-

fense of entrapment is at issue, \*\*\* the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents").) The "criminal act" is, obviously, the crime with which the defendant is charged, not some other, uncharged crime. See Ill. Ann. Stat., ch. 38, par. 7—12, Committee Comments—1961 (Smith-Hurd 1989) (now 720 ILCS Ann. 5/7—12, Committee Comments—1961 (Smith-Hurd 1993)); Tipton, 78 Ill. 2d at 495 (Clark, J., dissenting).

The State caused further confusion by arguing that the defendant's criminal purpose was "to shut up witnesses, to make it come to a grinding halt." This may be a motive, which the State does not have to prove, and it may be relevant to the defendant's intent, but it is not in and of itself a criminal purpose because there is nothing necessarily criminal in shutting people up or bringing things to a "grinding halt," whatever those phrases may mean.

The State argued at trial and again on appeal that the criminal purpose could be an elongated series of events that began with the defendant's original idea of having the victims injured. If this argument were correct, then there was no possible way for the defense of entrapment to succeed. It was a nullity, a pointless exercise. The defendant admitted he solicited battery and had the criminal purpose to commit that crime, but he did not admit he had the criminal purpose to solicit murder. Because the State decided, as it had the right to, not to charge the defendant with soliciting aggravated battery, and because the State argued successfully against allowing the defendant a lesser included instruction as to aggravated battery, the State won its case before it ever went to the jury.

The fallacy of the State's position may most simply be stated as a simple algebraic equation. If "A" equals criminal purpose, "B" equals soliciting battery and "C" equals soliciting murder, then—according to the State's argument—just because "A" equals "B," "A" must also automatically equal "C." But there is no logic in this. We acknowledge that the defendant's admission that he solicited battery was admissible evidence of his desire to solicit murder, but it was not a conclusive presumption or proof that he solicited murder.

The jury's confusion was compounded by the following exchange, which occurred during the State's final rebuttal arguments:

"MR. BAYER: The defendant has admitted he committed the crime. And the only way you can find him not guilty is if you avail him of the legal defense and decide that his criminal purpose did not originate with him, and that by his own overbearing action on behalf of the State, they incited and induced and

planted in an innocent man this idea of beating up or killing someone.

MR. FAWELL: Objection.

THE COURT: 'Killing someone'—objection is sustained as to the form of that."

Precisely the opposite ruling is correct. The prosecution should not have been allowed to say that entrapment would exist only if the government induced or incited defendant to "the beating." The objection as to "the beating" should have been sustained, but the prosecutor's statement as to "killing someone" was correct and not objectionable.

The dissent states that "it appears in the lifeless record, this comment by the trial judge is ambiguous; however, depending upon inflection and emphasis, the judge may have been informing the jury instead that 'killing someone' is what the prosecutor should have said." (254 Ill. App. 3d at 138.) To this we can only respond that the "lifeless" record is precisely upon what appellate justices are supposed to base their decisions. The dissent offers no authority for the proposition that we may speculate about the inflection in a trial judge's voice or the effect it may have on a jury. It is well settled that a reviewing court may not look beyond the record in making its decision but is restricted in its examination to the record as it is. *People v. Edwards* (1978), 74 Ill. 2d 1, 7; *People v. Dixon* (1982), 105 Ill. App. 3d 340, 349.

At best there was much confusion created by the State's arguments and the manner in which the court sustained objections. At worst, the court allowed the State to argue that entrapment could not be a viable defense because the defendant's admission that he intended to solicit an aggravated battery was the equivalent "criminal purpose" to solicit murder. Upon retrial, the State may argue that the defendant's admission as to soliciting battery is a *factor* or *evidence* that the jury may consider in determining whether the defendant was entrapped as to soliciting murder. However, the admission as to aggravated battery is not a *prima facie* refutation of the entrapment defense as to solicitation of murder.

We also determine that under the facts of this case, the defendant should have been permitted the lesser included instruction he requested. A defendant generally has the right to have the jury instructed on his theory of the case and on the law applicable to any statement of facts which the jury may properly find to have been proved. (*People v. Schnurr* (1990), 206 Ill. App. 3d 522, 533.) The State argued at trial, and the trial court agreed, that the defendant

could not have a lesser included instruction because it would be "legally impossible" for defendant to admit guilt as to solicitation to murder and get a lesser included instruction as to solicitation of aggravated battery. We disagree.

■ There would be nothing either legally or logically inconsistent in a finding that the defendant was innocent of solicitation to murder but guilty of soliciting a battery. Legal inconsistency arises when verdicts of guilty and acquittal are returned on charges that arise from the same set of facts and "the same essential element or elements of each crime were found both to exist and not to exist." (*People v. Murray* (1975), 34 Ill. App. 3d 521, 531.) Logical inconsistency arises when verdicts, though not based on the same elements, nonetheless "involve both the acceptance and the rejection of the same theory of the case for the State or the same theory of the defense." (*Murray*, 34 Ill. App. 3d at 532.) In this case the jury would not have both to accept and reject the same theory to acquit as to solicitation of murder but convict on solicitation of battery, so there would be no logical inconsistency. The two crimes do not have the same elements because the specific intent to solicit murder is necessarily different than the specific intent to solicit a battery, and specific intent is an element of the crime of solicitation. Thus, verdicts of innocent of solicitation of murder but guilty of solicitation of battery would not be legally inconsistent.

There was nothing illogical in the defendant arguing that he was entrapped as to solicitation of murder but not as to soliciting battery when the facts indicated that the alleged entrapment unfolded over a series of conversations. Entrapment is a valid defense when a person is prosecuted for a transaction that occurs after a series of transactions. (*People v. Gaytan* (1989), 186 Ill. App. 3d 919, 925.) In *People v. Keen* (1990), 206 Ill. App. 3d 940, the defendant was charged with committing two separate drug offenses and raised the entrapment defense. He was acquitted of the first charge but found guilty of the second. On appeal the court noted that a finding of innocent as to one transaction did not mandate a similar finding as to the second. (*Keen*, 206 Ill. App. 3d at 950.) Thus, there was no inconsistency in such verdicts.

An included offense "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." (Ill. Rev. Stat. 1989, ch. 38, par. 2—9(a) (now 720 ILCS 5/2—9(a) (West 1992)).) A greater offense is one that includes "every element of the lesser offense, plus an additional element or elements, so that

one cannot commit the offense charged without committing the lesser offense." (*People v. Stroner* (1983), 96 Ill. 2d 204, 209.) If some of the elements of the crime charged constitute a lesser crime, the defendant, if the evidence justifies, is entitled to a lesser included instruction. (*People v. Cramer* (1981), 85 Ill. 2d 92, 97.) A lesser included instruction may be proper when the lesser charge has a broad foundation in the charging instrument alleging the greater crime and the evidence at trial supports giving the lesser instruction. *People v. Bryant* (1986), 113 Ill. 2d 497, 502-05.

In the present matter, there was a disputed factual element in the greater offense not required for the lesser: whether defendant was entrapped as to solicitation of murder.

We find no case or statute which declares whether solicitation of aggravated battery is *always* an included offense of solicitation of murder. Illinois courts have made *ad hoc* determinations that certain solicitation crimes do not have particular included offenses. See *Stroner* (96 Ill. 2d at 209 (solicitation is not a lesser included offense of conspiracy)); *Schnurr* (206 Ill. App. 3d at 533 (solicitation to commit theft is not an included offense of solicitation to murder)); *People v. Matthews* (1980), 89 Ill. App. 3d 749, 750 (soliciting for a prostitute is not a lesser included offense of pandering).

It is clear that solicitation and the other inchoate offenses are not lesser included offenses of the principal crimes to which they attach when charged. (*People v. Hairston* (1970), 46 Ill. 2d 348, 356-57, citing Ill. Ann. Stat., ch. 38, par. 8—5, Committee Comments—1961, at 391 (Smith-Hurd 1967) (now 720 ILCS_ 5/8—5, Committee Comments—1961, at 520 (Smith-Hurd 1993)).) Aggravated battery is a lesser included offense of murder (*People v. Lyons* (1974), 26 Ill. App. 3d 193, 198), and the underlying crime solicited is an integral part of any solicitation offense. (*Schnurr*, 206 Ill. App. 3d at 533.) These two principles read together, however, do not mandate the conclusion that solicitation of aggravated battery must always be an included offense of solicitation to commit murder. The mere fact that two or more offenses arise out of a series of incidental or closely related acts does not mean those crimes are necessarily included offenses. *People v. Latham* (1979), 73 Ill. App. 3d 995, 997.

In the present matter, however, a lesser included instruction should have been given because the State, in its case in chief, introduced into evidence all of the tape-recorded conversations involving the defendant, Bowden and Holguin, which covered a two-week period, as well as testimony of other conversations that spanned three months. This series of conversations comprised one virtually seamless

set of facts relating to the ultimate issue of whether the defendant was entrapped as to solicitation of murder. The same facts were relevant to determining whether defendant solicited aggravated battery and provided more than sufficient support for a finding by the jury that the defendant may have committed the lesser offense of solicitation of battery. Since the "same facts," for purposes of applying the Illinois included-offense statute, go to both solicitation of murder and solicitation of battery, they are included offenses.

The dissent claims the fact that the defendant "incidentally" committed another, lesser offense "at or near the same time he solicited murder for hire" is "wholly irrelevant." (254 Ill. App. 3d at 136.) This "incidental" crime was solicitation to battery, about which the State, in its case in chief, presented volumes of evidence. It was the State that made this lesser offense relevant.

The specific intent required for soliciting murder is the desire that a person be killed. The specific intent for soliciting aggravated battery is the intent to cause a harmful touching. We do not see how it is possible for a person to be murdered without being harmfully touched or injured. Therefore, the intent to batter is implicit in the intent to murder. Assuming, *arguendo*, that one could intend to kill without intending a harmful contact or touching, we believe that a lesser instruction was warranted in this case because, as in *Bryant*, there was a broad foundation for the lesser offense in the greater charge. As *Bryant* points out, the reason a defendant may be entitled to a lesser included instruction is that it "provides an important third option to a jury which, believing that the defendant is guilty of something but uncertain whether the charged offense has been proved, might otherwise convict rather than acquit the defendant of the greater offense." (*Bryant*, 113 Ill. 2d at 502.) The present matter presents a classic example of this. The jury was forced to choose between convicting the defendant of solicitation of murder or allowing him to go free when the defendant admitted he committed a serious felony, solicitation of aggravated battery.

The dissent further claims that it is "mixing apples and oranges to suggest that a jury should be given the option of finding defendant guilty of a separate lesser crime as a compromise alternative to refusing to excuse him from liability for the greater crime which he has already admitted committing. Any such suggestion loses sight of the fundamental concept of an 'included' offense." (254 Ill. App. 3d at 136.) We suggest that it is the dissent which has lost sight of the fundamental concept of the included offense, which finds a paradigm example in this case. The lesser crime of soliciting battery is

part of the greater umbrella crime of soliciting murder because the State chose to display the evidence as one continuing set of facts that culminated in solicitation of murder.

Of course the defendant admitted soliciting murder. He was required to as a prerequisite to pleading entrapment. The question, which never got to the jury, was whether the defendant was guilty of soliciting murder or just guilty of soliciting battery. As to the "compromise" criticized by the dissent, we repeat that it was the State which chose to gamble that the jury would not set free a man who admitted to soliciting battery but would, instead, find him guilty of soliciting murder even if it doubted he was guilty of that crime. The dissent seems to believe that any attempt by the defendant to show he had a lesser intent than soliciting murder constitutes an impermissible compromise. We deem it to be a perfectly legitimate attempt to prove lack of murderous intent by the defendant.

On retrial, assuming the defendant again offers the entrapment defense as to solicitation to murder but not as to battery, the trial court must make it clear to the jury that the State's burden in disproving entrapment is showing that the criminal purpose of soliciting *murder*, not battery, originated with defendant. All of the tape-recorded conversations offered at trial were relevant to both solicitation to commit battery and solicitation to murder. What the State may *not* do on retrial is argue that, because the defendant originated the idea of having Cherim and Haliotis beaten, he is conclusively proved to have originated the idea of having them killed.

The defendant also claims that it was reversible error for the trial court to refuse to provide jurors with a requested definition of the word "originated." Because we have reversed on other grounds, we need not decide this question.

The judgment of the circuit court of Du Page County is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

QUETSCH, J., concurs.

JUSTICE DOYLE, dissenting:
I respectfully dissent.

It is my opinion that the trial court was correct in refusing an instruction on the lesser offense of solicitation to commit aggravated battery. I believe the majority is mistaken in failing to recognize the

unique posture of the case when the issue of entrapment was presented.

I agree that, under other circumstances, this offense could be a lesser included offense of solicitation of murder for hire. In such a case, where intent of a defendant to cause the victim's death is a *disputed* element, the trier of fact might find that the State has failed to prove that element but has nonetheless proved defendant's intent to cause the infliction of an aggravated battery. Where a dispute exists as to the proper interpretation of the defendant's intent, as manifested by his words and conduct, the defendant has a right to have the option of the lesser included crime submitted to the jury.

When the defense of entrapment is raised, however, there is no longer any dispute as to a defendant's intent. A prerequisite to relying on entrapment is the defendant's admission that he committed all elements of the charged offense, including in this case the intention to cause death. (*People v. Gillespie* (1990), 136 Ill. 2d 496, 503.) Once commission of the crime has been admitted by a defendant, the sole issue to be considered by the trier of fact is whether public policy requires that the defendant be excused from conviction in view of alleged police misconduct inducing him to so act. The fact that the defendant has incidentally committed some other lesser offense at or near the same time he solicited murder for hire is, I submit, wholly irrelevant to the determination of this public policy issue. It is mixing apples and oranges to suggest that a jury should be given the option of finding defendant guilty of a separate lesser crime as a compromise alternative to refusing to excuse him from liability for the greater crime which he has already admitted committing. Any such suggestion loses sight of the fundamental concept of an "included" offense.

A defendant cannot be convicted of an uncharged offense which is not an included offense of the offense for which the defendant is charged. (*People v. Schmidt* (1988), 126 Ill. 2d 179, 183.) An "included offense" is established "by proof of the same or less than all of the facts or a less culpable mental state (or both) than that which is required to establish the commission of the offense charged." Ill. Rev. Stat. 1989, ch. 38, par. 2—9(a) (now 720 ILCS 5/2—9(a) (West 1992)).

Under the facts of the present case, solicitation to commit aggravated battery was a lesser offense, but it was not an *included* one. The offense of solicitation is consummated and complete when the principal offense is encouraged or requested with the specific intent that the principal offense be committed. (See 720 ILCS 5/8—1, Committee Comments—1961, at 408 (Smith-Hurd 1993); *People v. McCommon* (1979), 79 Ill. App. 3d 853, 862.) By asserting entrapment,

defendant has admitted his intent that a murder be committed. He now argues, however, that the jury should have been invited to focus upon separate statements he allegedly made which could be construed as also requesting an aggravated battery. Stated otherwise, defendant's argument claims two separate acts of solicitation, one committed of his own volition and the other allegedly resulting from improper inducement by the police. Because the aggravated battery solicitation, upon which defendant requested an instruction, was based upon a different act than the charged offense, it could not provide a basis for a lesser included offense instruction. Any finding that defendant committed the elements of aggravated battery but was not shown to have possessed the additional element of intent to cause death would irreconcilably conflict with defendant's admitting all elements of solicitation of murder.

The majority also finds reversible error in what it characterizes as misstatements of law made by the prosecutor during final argument. First, it points to the prosecutor's statement: "The judge will instruct you that induced to commit an offense, the defendant was never induced or incited to have a severe beating done on Aric Cherim or Jamie Haliotis." The trial court overruled a defense objection to this statement. I find it significant, however, that almost immediately after that ruling the prosecutor went on to clarify this point by stating to the jury, "The defendant was never ever induced or incited to have these men beaten. *And I suggest to you he was never ever induced or incited to have the men killed.* It was his decision. He told you himself he made that decision." (Emphasis added.) In my view, the post-objection explanation by the prosecutor removed any prejudice which might have existed, and this line of argument, taken in its entirety, was appropriate.

Next, the majority is legitimately concerned with the potential for misinterpretation of the State's comment that defendant's "criminal purpose" was to silence the witnesses, and that defendant's method of accomplishing this purpose would be either a severe beating or killing them. The prosecutor added, "But the criminal purpose originated with the defendant." I agree that, in isolation, this statement might be interpreted as inviting the jury to convict on the solicitation of murder charge even if defendant did not originate the purpose of soliciting a murder. Considering, however, the series of conversations between defendant and the undercover officer during which defendant spoke alternatively of killing the victims and severely injuring them, it was legitimate for the State to argue that the idea for *any* criminal attack originated with defendant and not with the police. Although

not conclusive, this factor might be considered as evidence tending to prove that defendant also originated the intent to cause death. In overruling the objection the trial court might well have perceived this to be the thrust of the prosecutor's argument. In any event, although admittedly ambiguous, the argument appears to stop short of constituting a pronouncement of law that any criminal purpose originating with defendant would suffice to convict for solicitation of murder. In light of the instructions to the jury on the elements of solicitation of murder and on entrapment, I would not find sufficient prejudice for reversal on this point.

Finally, the prosecutor argued that defendant could be acquitted on an entrapment theory only if the State "incited and induced and planted in an innocent man this idea of beating up or killing someone." In response to defense counsel's objection, the trial court responded, "'killing someone'—objection is sustained as to the form of *that*" (emphasis added). The majority concludes that the trial court erroneously sustained the objection as to the "killing someone" comment while failing to sustain it as to the argument that defendant could be acquitted only if the jury found that the State initiated the idea of "beating up" the victim. As it appears in the lifeless record, this comment by the trial judge is ambiguous; however, depending upon inflection and emphasis, the judge may have been informing the jury instead that "killing someone" is what the prosecutor should have said. Also when the trial court sustained the objection as to the form of *that*, its reference might have been to the form of the entire statement, as opposed to only modifying the words "killing someone" as the majority assumes. In any event, in view of the evidence presented and the instructions given, I would not find such an ambiguity to require reversal.