THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANGEL M. RIVERA, Defendant-Appellant.

Second District    No. 2—92—0528

Opinion filed May 12, 1994.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers, Robert J. Biderman, and Rebecca L. White, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a jury trial in the circuit court of Winnebago County, defendant, Angel M. Rivera, was convicted of aggravated arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1(a)(1) (now 720 ILCS 5/20—1.1(a)(1) (West 1992))) and was sentenced to a 30-year term of imprisonment. On appeal defendant raises the following issues: (1) whether the trial court erred in refusing to give the jury a lesser included offense instruction on criminal damage to property; (2) whether improper remarks by the prosecutor during closing argument require a new trial; and (3) whether his sentence was excessive when compared with sentences imposed on two other participants in the offense.

On July 29, 1991, at about 10 p.m., Henry and Lillian Vandenbusch discovered that their house was on fire. Both were able to leave the house safely. An investigation determined that the fire had been intentionally set on the back porch of the Vandenbusch house and that an accelerant had been used. Defendant and two other individuals, James Benjamin and Daniel Weeks, were charged with aggravated arson in connection with the fire. Benjamin and Weeks pleaded guilty to arson and agreed to testify on behalf of the State against defendant.

As developed by the testimony of several members of the Vandenbusch family, the apparent motive for the offense related to defendant's turbulent relationship with Henry and Lillian Vandenbusches' granddaughter, Shari Vandenbusch. Shari testified that she had become involved in a romantic relationship with defendant near the end of 1990. In the following months, problems developed. Shari wanted to end the relationship, but defendant threatened to hurt her family if she left him. Shari testified that on one occasion defendant threatened to burn her grandmother's house down. Defendant was aware of Shari's close relationship with her grandparents, who lived near Shari and her parents and sister.

Beginning in June 1991, there were a number of confrontations involving defendant, Shari's father, Mark Vandenbusch, and her uncle, Brian Vandenbusch. Mark testified that defendant would frequently come by their house screaming obscenities and threats. On a few occasions, Mark, Brian, or both had chased defendant and his friends. Shari and defendant finally broke off their relationship early in 1991.

Witnesses for the State testified about two occasions on which defendant directed threats against the Vandenbusch family. On July 11, while gathered with a group of people on the porch of a house across the street from Shari's house, defendant pointed a gun at Shari's house and commented that he wanted revenge and was going to "blow the bitch up." During a cookout on July 21, defendant remarked that he wanted to burn Shari's house down.

Shari's cousin, Michelle Jackson, testified that at about 7:30 p.m. on July 29 she was walking to Shari's house when she encountered defendant standing beside a car in which James Benjamin and others were seated. They were apparently picking up Daniel Weeks. Defendant told Michelle to give her family the message that he was going to burn somebody's house, ruin the pool, and ruin the cars. Shortly after defendant and the others left, Michelle related the incident to Shari's sister, Lori Vandenbusch, who was just arriving home from work. Lori testified that about a half hour to an hour after speaking with Michelle she encountered defendant in a car with another individual. Defendant said he was going to mess up the pool and the cars and was going to hurt someone in Lori's family. Defendant drove off, stopping in front of Daniel Weeks' house to pick Weeks up.

On July 29, defendant was staying at a home that Kevin Mabie shared with Dawn West and Larry Adams. That day, Adams had been involved in an altercation with Eric May, who was dating Shari Vandenbusch's sister, Lori, and was living with Shari, Lori, and their parents. Defendant and James Benjamin were present at Mabie's house on the evening of July 29, when Mabie, Adams, and West arrived accompanied by Daniel Weeks, whom Mabie had picked up on his way home from work. At that time defendant learned of the incident involving Eric May and Larry Adams and became extremely angry. Adams testified that defendant said "he was going to get Eric May." According to Adams, defendant asked for some money in order to "torch grandma's house," and Adams gave defendant $2. Kevin Mabie testified that defendant asked to borrow a gas can, and Mabie provided one. According to Mabie, defendant said he was "going to get them all" and was going to "make them pay." Mabie saw defendant, James Benjamin, and Daniel Weeks drive off in Benjamin's car.

Adams and Mabie saw defendant again about 10 to 15 minutes later. Adams heard defendant say, "We torched the house." Mabie overheard James Benjamin tell defendant that he "couldn't believe how fast the house went up."

James Benjamin testified that upon learning of the altercation between Eric May and Larry Adams defendant said that "someone was going to die by 12:00 o'clock" and that he was going to "burn their house down." Defendant told Benjamin and Weeks to get in Benjamin's car. Defendant came out to the car carrying a gas can. On defendant's instructions, they drove to a gas station and defendant filled the gas can. After leaving the gas station, they stopped at a location near the home of Henry and Lillian Vandenbusch. Defendant told Benjamin and Weeks to come with him and threatened them when they were reluctant to do so. Benjamin and Weeks followed defendant to the yard of the Vandenbusch house, which was surrounded by two fences. Defendant climbed over both fences, but Benjamin and Weeks only climbed over the first fence. Defendant doused the porch with gasoline, and Benjamin saw flames. Benjamin denied having been chased by members of the Vandenbusch family, although he acknowledged that he had been involved in a fight with Eric May.

Daniel Weeks gave a similar account of the events on the evening of July 29. Weeks also testified, during cross-examination, that he had seen Michelle Jackson at around 8 p.m. on July 29, when Kevin Mabie, Dawn West, and Larry Adams came to pick him up. Defendant was not present with them at that time. Kevin Mabie and Daniel Weeks both testified that defendant had contacted them before trial and had asked them to testify that James Benjamin had set fire to the home of Henry and Lillian Vandenbusch.

Defendant testified on his own behalf. According to his testimony, on July 29, he and James Benjamin drove to defendant's former place of employment so that defendant could inquire whether a job was available. On the way, they observed Brian Vandenbusch's car. Defendant related that Brian had chased both defendant and Benjamin three days earlier, and Brian or another member or members of the Vandenbusch family had chased them on a prior occasion earlier in July. Seeing Brian's car, Benjamin said, "Come on, let's go get them," but defendant told Benjamin it was "too early." According to defendant, Benjamin had also been involved in an altercation with Eric May.

Defendant related that he became upset that evening when he learned that Eric May had struck Larry Adams. According to defendant, Benjamin said to him, "that's it, I will take care of it for you.

What have I got to lose?" Defendant responded that they should go get Eric May. Benjamin told defendant to get a gas can, and defendant got one from Kevin Mabie. Defendant acknowledged that he may have asked Larry Adams for a couple of dollars, but stated during cross-examination that the money was for cigarettes. Benjamin, Weeks, and defendant drove to the gas station, and Benjamin said he was going to torch the house. Defendant thought Benjamin meant Shari's house. When he realized that Benjamin was referring to the house of her grandparents, Henry and Lillian, defendant repeatedly implored Benjamin not to do anything, saying that Henry and Lillian "ha[d] nothing to do with it." Defendant testified that Benjamin poured gasoline on the porch of Henry and Lillian's house, and as he backed away from the porch, he splattered some gasoline on defendant. At that point defendant grabbed the gas can, walked over by the garage, and poured the rest of the gasoline out. Defendant ran back to the car and found that Daniel Weeks was already in the backseat. Four or five minutes later, James Benjamin came running back and said "I torched it."

On cross-examination, defendant acknowledged that he had had problems with Mark and Brian Vandenbusch and Eric May, but contended that he had not instigated the confrontations. Defendant denied having pointed a gun at Shari's house and denied having made threats, during a cookout, to burn Shari's house down. Defendant denied telling Michelle Jackson to give her family the message that he was going to burn somebody's house down, and denied seeing Lori Vandenbusch on July 29. Defendant denied asking Kevin Mabie and Daniel Weeks to testify that Benjamin had set the fire.

Donald Roberts, a private investigator, testified that he was present during interviews of Kevin Mabie and Larry Adams conducted by defense counsel prior to trial. During his interview, Mabie indicated that it was James Benjamin's idea to "torch the house," and defendant had responded that they should just "get Eric May." Larry Adams made similar statements during his interview and stated that it was James Benjamin who had asked him for a gas can.

Ben Manning testified that on July 11 defendant and several other people were gathered on the porch of his house, which is near Shari Vandenbusch's house. Defendant never pointed a gun at Shari's house and did not threaten to "blow up" Shari or to shoot her. Manning also testified that he saw James Benjamin at about 10:30 p.m. on July 29. Benjamin appeared shaken and told Manning he had burned down a house. Manning testified that earlier in July he encountered defendant, Daniel Weeks, and James Benjamin running to his house. Benjamin told him that Eric May and some members of

the Vandenbusch family were chasing them. Benjamin said he wanted to "get" the Vandenbusches and Eric May.

Defendant first argues that the trial court erred in refusing to instruct the jury regarding the offense of criminal damage to property (Ill. Rev. Stat. 1989, ch. 38, par. 21—1(1)(a) (now 720 ILCS 5/21—1(1)(a) (West 1992))). Defendant contends that criminal damage to property is a lesser included offense of aggravated arson and that the evidence in the case at bar justified giving an instruction regarding that offense. He notes his testimony that when James Benjamin was dousing the Vandenbusch house with gasoline, defendant grabbed the gasoline can and poured the remaining gasoline on the Vandenbusches' garage. Defendant contends that the jury could have concluded that he was not guilty of arson, but might have found that his conduct in pouring the gasoline on the garage constituted criminal damage to property.

It is well established that a criminal defendant may be entitled to have the jury instructed on a less serious offense that is included in the one with which he is charged. (*People v. Bryant* (1986), 113 Ill. 2d 497, 502.) Where there is some evidence in the record which, if found credible by the jury, would reduce the crime to a lesser offense, an instruction on the lesser offense should be given. (*People v. Lockwood* (1992), 240 Ill. App. 3d 137, 145.) The reason for instructing the jury on the lesser included offense is that the instruction "provides an important third option to a jury which, believing that the defendant is guilty of something but uncertain whether the charged offense has been proved, might otherwise convict rather than acquit the defendant of the greater offense." (*Bryant*, 113 Ill. 2d at 502, citing *Keeble v. United States* (1973), 412 U.S. 205, 212-13, 36 L. Ed. 2d 844, 850, 93 S. Ct. 1993, 1997-98.) However, an instruction on a lesser included offense is only required in cases where the jury could rationally find the defendant guilty of the lesser offense and not guilty of the greater offense. *People v. Baney* (1992), 229 Ill. App. 3d 770, 773.

As pertinent here, an "[i]ncluded offense" is defined by statute as an offense which "[i]s established by proof of the same or less than all of the facts or a less culpable mental state (or both), than that which is required to establish the commission of the offense charged." (Ill. Rev. Stat. 1989, ch. 38, par. 2—9(a) (now 720 ILCS 5/2—9(a) (West 1992)).) As our supreme court has observed, the statutory definition does not explain " 'which of the following is determinative in deciding if a particular offense is an included offense of another: the abstract statutory definition of the greater crime; the greater crime as it is alleged in the indictment or other charging document; or the greater

crime as its necessary elements are proved at trial.' " (*Bryant*, 113 Ill. 2d at 503, quoting *People v. Mays* (1982), 91 Ill. 2d 251, 255; *People v. Pedersen* (1990), 195 Ill. App. 3d 121, 129.) Recent decisions have recognized that either review of the abstract charge, or review of the offenses as charged, is an appropriate means for determining whether a particular offense is a lesser included offense of another. (See *People v. LePretre* (1990), 196 Ill. App. 3d 111, 121.) In other words, certain offenses are lesser included offenses of other offenses *in all cases* as a result of the manner in which the two offenses are defined by statute. The relationship between the offenses is such that it is "impossible to commit the greater offense without committing the lesser included one." (*People v. Maldonado* (1992), 224 Ill. App. 3d 913, 917.) Even where this relationship does not exist as a function of the statutory definitions of the charged offense and the lesser offense for which an instruction is sought, our supreme court has recognized that it may be appropriate to give an instruction on an uncharged lesser offense in a particular case when the charging instrument sets out the "main outline" of the lesser offense and the evidence otherwise supports giving the instruction. See, *e.g.*, *People v. Bryant* (1986), 113 Ill. 2d 497, 505; *People v. Dace* (1984), 104 Ill. 2d 96; see also *People v. Jones* (1992), 149 Ill. 2d 288; *People v. LePretre* (1990), 196 Ill. App. 3d 111, 122; *People v. Pedersen* (1990), 195 Ill. App. 3d 121, 127.

Defendant essentially takes the position that criminal damage to property as described in subsection (1)(a) of section 21—1 of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1989, ch. 38, par. 21—1(1)(a) (now 720 ILCS 5/21—1(1)(a) (West 1992))) is *by statutory definition* a lesser included offense of arson and aggravated arson. As relevant here, the Criminal Code defines aggravated arson as follows: "[a] person commits aggravated arson when in the course of committing arson he knowingly damages, partially or totally, any building or structure, including any adjacent building or structure, and (1) he knows or reasonably should know that one or more persons are present therein." (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1(a)(1) (now 720 ILCS 5/20—1.1(a)(1) (West 1992)).) A person commits the underlying offense of arson when "by means of fire or explosive, [a person] knowingly: (a) [d]amages any real property, or any personal property having a value of $150 or more, of another without his consent." (Ill. Rev. Stat. 1989, ch. 38, par. 20—1(a) (now 720 ILCS 5/20—1(a) (West 1992)).) A person commits the offense of criminal damage to property when he or she "knowingly damages any property of another without his consent." (Ill. Rev. Stat. 1989, ch. 38, par. 21—1(1)(a) (now 720 ILCS 5/21—1(1)(a) (West 1992)).) Defendant contends that the only elements differentiating aggravated arson

from criminal damage to property are that the damage be done by fire and that the defendant knew or reasonably should have known that the structure set on fire was occupied.

We are aware that in *People v. Lockwood* (1992), 240 Ill. App. 3d 137, which defendant has brought to our attention, the Appellate Court, First District, concluded that subsection (1)(a) of section 21—1 does not apply to knowing damage of property by fire, and, consequently, criminal damage to property as defined in that subsection is not a lesser included offense of aggravated arson. (240 Ill. App. 3d at 148.) We note, however, that since the arson provisions of the Criminal Code do not apply in cases of damage to personal property unless it has a value of at least $150, an apparent consequence of the reasoning in *Lockwood* is that where a person *knowingly* damages personal property worth less than $150 by fire or explosive, he or she would be guilty of neither arson nor criminal damage to property. Because it seems unlikely that the legislature intended that result, we are somewhat hesitant to adopt the reasoning in *Lockwood* as a basis for deciding the case at bar. However, it is unnecessary at present to resolve definitively the question raised in *Lockwood*. As explained below, assuming, without deciding, that criminal damage to property as defined in section 21—1(1)(a) is a lesser included offense of arson, we nonetheless conclude that defendant's tendered instructions were properly refused under the circumstances of this case.

An instruction on a lesser included offense is normally sought primarily on the basis of the State's evidence and typically relates to the specific conduct which is the basis of the prosecution. Thus, an instruction is appropriate where the jury might believe some but not all of the State's evidence—too little to convict of the charged offense, but enough to convict of an uncharged lesser included offense. It is in these situations that it is important to give the jury a "third option," since the jury might otherwise convict the defendant of the charged offense, notwithstanding some doubt as to the State's proof. (See *Keeble v. United States* (1973), 412 U.S. 205, 212-13, 36 L. Ed. 2d 844, 850, 93 S. Ct. 1993, 1997-98.) This rationale does not apply with the same force where the defendant seeks an instruction based not only on an uncharged offense, but on conduct which is merely incidental to that with which he is charged. To illustrate hypothetically, a defendant accused of murder might attempt to prove as an alibi that at the time of the murder he was engaged in the commission of an unrelated battery on the other side of town. An instruction on battery would seem inappropriate in that situation.

As noted above, defendant bases his argument that he was

entitled to a criminal damage to property instruction on his testimony that after taking the gasoline can away from James Benjamin (the actual arsonist), defendant poured gasoline on the Vandenbusches' garage, which apparently suffered no fire damage. Defendant contends that based on this testimony the jury could have acquitted him of aggravated arson but found him guilty of criminal damage to property based on his conduct in pouring the remaining gasoline on the garage. Defendant does not suggest that the jury could have convicted him merely of criminal damage to property with respect to the fire damage to the Vandenbusch house. It is abundantly clear from the evidence that an arson offense (*e.g.*, arson or aggravated arson) was committed, and the factual dispute at trial was who actually set the fire. The questions for the jury to decide were whether defendant set the fire, and, if not, whether he was responsible, under the principles of accountability, for the conduct of the individual who did. Defendant bases his request for a lesser included offense instruction on conduct which is separate and distinct from that with which he was charged.

We find *People v. Landwer* (1993), 254 Ill. App. 3d 120, recently decided by a divided panel of this court, to be instructive in this regard. In *Landwer*, the defendant was prosecuted for solicitation of murder for hire. The principal evidence against the defendant consisted of recorded conversations between the defendant and a police officer posing as a "hit man." Early in the conversations, the defendant suggested that the supposed hit man might simply injure the intended victim. The officer demanded precise instructions regarding what the defendant wanted him to do to the intended victim, and the defendant's closing comments suggested that the defendant wanted the intended victim killed. The defendant's theory of the case was essentially to concede that he originated the criminal purpose of soliciting that the intended victim be beaten, but to maintain that the ersatz hit man improperly induced him to agree to the murder of the intended victim, instead of a mere beating. Accordingly, the defendant interposed the defense of entrapment with regard to the charge of solicitation of murder for hire and requested that the jury be instructed on the lesser included offense of solicitation of aggravated battery. We concluded that the trial court erred by refusing to give the requested instruction.

The dissent in *Landwer* noted that the defendant's use of the entrapment defense constituted an admission to the elements of the charged offense, such that the only issue for the jury was whether, as a matter of public policy, police misconduct inducing the commission of the offense excused the defendant's otherwise illegal actions. (254 Ill. App. 3d at 136 (Doyle, J., dissenting).) The dissent further stated:

"The fact that the defendant has incidentally committed some other lesser offense at or near the same time he solicited murder for hire is \*\*\* wholly irrelevant to the determination of this public policy issue. It is mixing apples and oranges to suggest that a jury should be given the option of finding defendant guilty of a separate lesser crime as a compromise alternative to refusing to excuse him from liability for the greater crime which he has already admitted committing. Any such suggestion loses sight of the fundamental concept of an 'included' offense.
\*\*\*

\*\*\* By asserting entrapment, defendant has admitted his intent that a murder be committed. He now argues, however, that the jury should have been invited to focus upon separate statements he allegedly made which could be construed as also requesting an aggravated battery. Stated otherwise, defendant's argument claims two separate acts of solicitation, one committed of his own volition and the other allegedly resulting from improper inducement by the police. *Because the aggravated battery solicitation, upon which defendant requested an instruction, was based upon a different act than the charged offense, it could not provide a basis for a lesser included offense instruction.*" (Emphasis added.) 254 Ill. App. 3d at 136-37 (Doyle, J., dissenting).

Consistent with the dissent's reasoning, the majority acknowledged that "[t]he mere fact that two or more offenses arise out of a series of incidental or closely related acts does not mean those crimes are necessarily lesser included offenses." (254 Ill. App. 3d at 133.) But the majority responded to the dissent by noting:

"This 'incidental' crime was solicitation to battery, about which the State, in its case in chief, presented volumes of evidence. It was the State that made this lesser offense relevant.
\*\*\*

\*\*\* The lesser crime of soliciting battery is part of the greater umbrella crime of soliciting murder because the State chose to display the evidence as one continuing set of facts that culminated in solicitation of murder.

\*\*\* As to the 'compromise' criticized by the dissent, we repeat that it was the State which chose to gamble that the jury would not set free a man who admitted to soliciting battery but would, instead, find him guilty of soliciting murder even if it doubted he was guilty of that crime." 254 Ill. App. 3d at 134-35.

Thus, the basic area of disagreement between the majority and the dissent in *Landwer* involves the significance of *who* introduced the evidence upon which the request for an instruction on a lesser included offense is predicated. While the dissent viewed the lesser

offense for which an instruction was sought as merely incidental to the charged offense, the majority found it persuasive that the lesser included offense was supported by "volumes" of evidence supplied by the State.

■ In the case at bar, defendant's theory for a lesser included offense instruction was based on different conduct from that with which he was charged. Unlike *Landwer*, here it was defendant, rather than the State, who supplied the evidence of the uncharged conduct for which the instruction was sought. Indeed, the State's evidence conflicted with defendant's in this regard, since Rockford Fire Department Investigator Mike Woodring testified that he did not detect the odor of gasoline on the garage. Thus, unlike *Landwer*, it cannot be said that the State chose to gamble that the jury, confronted with evidence that defendant poured gasoline by or on the garage, would choose to convict defendant of arson or aggravated arson rather than acquit him even if it doubted he was guilty of either crime. In these circumstances, the offense of criminal damage to property was not a lesser included offense of aggravated arson.

The instructions on criminal damage to property were properly refused for yet another reason. It is fundamental that an instruction on a lesser included offense must find support in the evidence. Even to the extent an instruction might theoretically be appropriate based on acts distinct from those charged, obviously those acts must constitute an offense in order to justify an instruction. Here there is simply no evidence that the garage suffered any damage. Defendant merely testified without elaboration that he poured the gasoline out of the can either by or on the garage. There was no evidence that this had any effect on the garage or otherwise harmed any of Henry and Lillian Vandenbusches' property. Apparently, none of the authorities investigating the fire discerned any damage to the garage that might have been caused by gasoline, and, indeed, Investigator Woodring did not detect gasoline on the garage. Accordingly, the trial court's refusal to instruct the jury on criminal damage to property was not error under the circumstances of this case.

Defendant next argues that improper comments by the prosecutor during closing argument require that his conviction be reversed. Defendant notes that several times during closing argument the prosecutor stated or implied that defendant was a liar. Defendant also contends that the prosecutor improperly bolstered the credibility of the State's witnesses.

■ Defendant failed to object at trial to the allegedly improper remarks and also failed to raise the issue in his post-trial motion. Accordingly, any error resulting from these comments is waived.

(*People v. Enoch* (1988), 122 Ill. 2d 176.) Defendant urges us to consider his argument under the plain error rule. (134 Ill. 2d R. 615(a).) Under the plain error rule, a reviewing court may consider issues which have been waived by an accused: (1) where the evidence is closely balanced, or (2) where the error is so fundamental and of such magnitude that the accused was denied a fair trial. (*People v. Lucas* (1992), 151 Ill. 2d 461, 482; *People v. Rushton* (1993), 254 Ill. App. 3d 156, 165.) As our recitation of the evidence above discloses, the evidence here was conflicting, there were a number of discrepancies in the testimony of the State's witnesses, and certain key witnesses for the State were impeached with evidence of prior statements inconsistent with their trial testimony. Under these circumstances, we consider the evidence to be sufficiently closely balanced to justify review of defendant's contentions under the plain error rule. We conclude, however, that the prosecutor's remarks do not constitute reversible error.

While defendant complains that the prosecutor's statements to the effect that defendant was a liar were impermissible, it has been held that "it is not improper to call the defendant a 'liar' if conflicts in the evidence make such an assertion a fair inference." (*People v. Manley* (1991), 222 Ill. App. 3d 896, 910; see also *People v. Rader* (1988), 178 Ill. App. 3d 453, 466.) Here, defendant's testimony conflicted in numerous instances with the testimony of the State's witnesses, and in many instances, the conflict could not fairly be attributed to an honest mistake or misunderstanding. Thus, the prosecution's suggestion that defendant was lying was a fair comment on the evidence.

Defendant also argues that the prosecutor improperly bolstered the credibility of certain witnesses for the State. It is improper for a prosecutor to state his personal opinion on the credibility of a witness (*People v. Emerson* (1987), 122 Ill. 2d 411, 434), or to place the integrity of the State's Attorney's office behind the witness' testimony (*People v. Lee* (1992), 229 Ill. App. 3d 254, 260). However, that did not occur here. The State may discuss the witnesses and their credibility and is entitled to assume the truth of the State's evidence. (*People v. Pryor* (1988), 170 Ill. App. 3d 262, 273.) In the remarks of which defendant complains, the prosecutor merely asserted that certain witnesses testified truthfully. The prosecutor did not comment on their credibility as a matter of his own personal belief and did not suggest that the State's Attorney's office would not put untruthful witnesses on the stand. Accordingly, the prosecutor's remarks were not improper. (See *Pryor*, 170 Ill. App. 3d at 273 (prosecutor did not improperly vouch for the credibility of its witness, Downs, in stating,

" 'Downs is right. Downs has told you what he saw. Downs is believable. *** Downs is correct' ").) Accordingly, the prosecutor's remarks were within the bounds of permissible argument.

Defendant's final argument is that his sentence of 30 years' imprisonment is excessive when compared to the sentences received by Daniel Weeks and James Benjamin. Subsequent to defendant's trial, Benjamin and Weeks entered negotiated pleas of guilty of arson before a different judge. Benjamin was sentenced to 28 days in jail and a two-year term of probation, and Weeks was sentenced to 130 days in jail and two-year term of probation. We note that while defendant filed a motion for reconsideration of his sentence, he did not raise any issue related to the disparity between his sentence and those given to Benjamin and Weeks. Instead, defendant merely contended that his sentence was excessive in light of the mitigating factors established at his sentencing hearing—an argument that defendant has not pursued on appeal. The failure to raise the disparity issue in his post-sentencing motion constitutes a waiver (*People v. Pasch* (1992), 152 Ill. 2d 133, 216), but even if defendant had properly preserved the issue, we would find his argument to be without merit.

■ While, in general, similarly situated defendants should not receive grossly disparate sentences, the mere fact that one defendant receives a substantially longer sentence than a codefendant is not by itself a violation of fundamental fairness. (*People v. Dominguez* (1994), 255 Ill. App. 3d 995, 1002.) "A disparity in sentencing can be justified by the degree of participation in the offense or differences in the defendants' criminal records." (*Dominguez*, 255 Ill. App. 3d at 1002.) Here according to the State's evidence defendant was principally responsible for the offense, while Weeks and Benjamin participated reluctantly and, according to their testimony, under duress to some extent. The trial court apparently credited the State's evidence over that presented by the defense, and, although defendant contends that the State's case was "fraught with inconsistencies and contradictions," we cannot say the trial court's view of the evidence was error. Thus, evidence of defendant's greater participation in the offense justifies a longer sentence.

More importantly, where a codefendant pleads guilty as part of a plea agreement, this court has held that "[a] sentence entered after a guilty plea does not provide a valid basis of comparison to a sentence imposed after a trial." *People v. Garcia* (1992), 231 Ill. App. 3d 460, 479 (no abuse of discretion in defendant's 45-year sentence, notwithstanding sentences of 25 years and 4 years given to codefendants in exchange for their guilty pleas); see also *People v. Bergman* (1984), 121 Ill. App. 3d 100, 108 (codefendant's sentence "was lower than

what it might have been because of his negotiated plea of guilty which included his willingness to assist in drug enforcement and also to testify against defendant").

Relying on *People v. Milton* (1989), 182 Ill. App. 3d 1082, 1093, defendant contends that while it may have been appropriate to have given him a longer sentence than Benjamin and Weeks, the amount of the difference was too great, and his sentence must be reduced. Defendant's reliance on *Milton* is misplaced. In *Garcia*, we stated that "[w]e do not believe that *Milton* modifies the general rule that a sentence imposed after a guilty plea does not form a valid basis of comparison with respect to a sentence imposed after a trial." (*Garcia*, 231 Ill. App. 3d at 479.) In *Garcia* we noted that in *Milton*, because of the defendant's youth, his lack of a prior record, and the fact that the victim was not injured, the imposition of the maximum sentence for armed robbery "appears to have been excessive regardless of any comparison with the codefendant's sentence." (*Garcia*, 231 Ill. App. 3d at 479.) Defendant does not presently suggest that his sentence was an abuse of discretion based on the aggravating and mitigating factors. Accordingly, *Milton* does not apply.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

GEIGER and BOWMAN, JJ., concur.